[No. B004978. Second Dist., Div. One. Mar. 21, 1985.]

HARBOR INSURANCE COMPANY,
Plaintiff, Cross-defendant and Appellant v.
CENTRAL NATIONAL INSURANCE COMPANY,
Defendant, Cross-complainant and Appellant;
ARGONAUT INSURANCE COMPANY et al.,
Defendants, Cross-complainants and Respondents.

COUNSEL

Morris, Polich & Purdy, Douglas C. Purdy and Robert S. Wolfe for Plaintiff, Cross-defendant and Appellant and for Defendant, Cross-complainant and Appellant.

Robert E. Brimberry, Edward A. Nugent, Hillsinger & Costanzo and Gary L. Green for Defendants, Cross-complainants and Respondents.

## OPINION

**LUCAS, J.**—This appeal arises from cross-claims for declaratory relief whereby successive insurers of a defendant sued for malicious prosecution of a civil action sought determination as to which of them was (or were) obligated to defend and indemnify the insured. Holding that for insurance coverage purposes malicious prosecution is an "occurrence" that happens upon favorable termination of the maliciously prosecuted action, the trial court granted summary judgment exonerating two carriers who had insured the defendant during a period which commenced after that action was filed but ended before the date of favorable termination. Appellants, the defendant's respective insurers when the maliciously prosecuted action was commenced and terminated, contend that all insurers during the pendency of the action should be held jointly responsible for coverage. We will reject this contention, together with respondents' concurrent request that we define a touchstone date for insurance coverage of all malicious prosecution cases, but will conclude that the trial court's determination that respondents' policies did not afford coverage for this particular case was correct. Accordingly we affirm.

### FACTS AND PROCEEDINGS BELOW

Between 1971 and 1978, A.J. Industries, Inc. (A.J.) unsuccessfully prosecuted an action against its former president and chairman, Ver Halen, seeking rescission of a compensation and settlement agreement the parties had previously entered. Ver Halen won that suit (hereinafter, the malicious action) by judgment entered January 16, 1976; A.J. appealed and this court affirmed the judgment on December 9, 1977 (*A. J. Industries, Inc.* v. *Ver Halen* (1977) 75 Cal.App.3d 751 [142 Cal.Rptr. 383]). After denial of A.J.'s petition for hearing by the Supreme Court, the remittitur was filed in the superior court on February 17, 1978.

During the six-year pendency of the malicious action, A.J. carried liability insurance covering the tort of malicious prosecution written by a number of successive primary and excess insurers. When it filed the malicious action A.J. was insured by Zurich Insurance Company (Zurich) to a limit of $300,000, and by appellant Harbor Insurance Company (Harbor) to a further limit of $5 million. While the action was pending, respondents Argo-

naut Insurance Company (Argonaut) and Midland Insurance Company (Midland) respectively assumed these positions as A.J.'s primary and excess carriers, until April 1, 1975.[1] Appellant Central National Insurance Company (Central) then took over coverage in both capacities, solely insuring A.J. to a limit of $5 million for a period that included the rendition of judgment in the malicious action and its affirmance.

On April 16, 1976, while A.J.'s appeal from the adverse judgment in the malicious action was pending, Ver Halen sued A.J. for malicious prosecution of that action. Although then insured by Central, A.J. tendered defense of the malicious prosecution suit to Zurich, which had been the primary carrier when the malicious action was commenced. Zurich accepted this tender and thereafter turned the matter over for handling to Harbor, the concurrent excess carrier. Harbor proceeded to defend the malicious prosecution action under a reservation of rights. Upon refusal of its further tender of this defense to Central, Midland and Argonaut, Harbor filed the instant action, against all of the other companies that had insured A.J. during the pendency of malicious action and also Ver Halen and A.J. itself, seeking a declaration of the rights and duties of the several carriers regarding A.J.'s defense and indemnification.

In the malicious prosecution suit Ver Halen once again defeated A.J.: after a favorable verdict on the issue of liability, Ver Halen obtained a stipulated judgment for $1.5 million compensatory damages. Harbor and Zurich contributed $700,000 and $300,000 respectively to satisfy this judgment. A.J. initially contributed the remaining $500,000 itself, but later was reimbursed that amount by Harbor, in settlement of a claim for "bad faith" which A.J. had asserted against Harbor by cross-complaint in the instant coverage action. The source of Harbor's payment to A.J. was a settlement, in like amount, paid to Harbor by Central, in exchange for dismissal from Harbor's instant claim for declaration of Central's responsibility to cover A.J.'s liability. By that settlement Central also assigned to Harbor *its* rights, if any, against Midland and Argonaut.

Harbor's complaint for declaratory relief predictably elicited a round of cross-complaints by the other insurers, asserting an assortment of positions as to insurance responsibility for malicious prosecution generally and A.J.'s tort in particular. Harbor, the insurer when the malicious action had been filed, urged that the operative event for coverage of the tort should be favorable termination of the malicious action; Central, A.J.'s insurer at that

---

[1]For part of this time another insurer—which later became insolvent and is not a party to this appeal—shared primary coverage with Argonaut.

juncture, contended that coverage should commence and be fixed upon initiation of the malicious action; and Argonaut and Midland, whose policies had not been effective at either of these suggested critical points, contended that regardless of which such event should be deemed determinative they were nowise responsible for A.J.'s indemnification or defense. Alternatively, all of these insurers proposed that malicious prosecution should be deemed a "continuing occurrence" over the lifetime of the malicious action, with the result that liability to indemnify A.J. would be apportioned among them.[2]

All four companies brought motions for summary judgment. The trial court denied the motions but did determine, as an issue without substantial controversy (Code Civ. Proc., § 437c, subd. (f)), that "The occurrence is upon favorable termination of the underlying [malicious] action (1-13-76)." Based upon this determination, Argonaut and Midland thereafter renewed their requests for summary judgment and the trial court entered summary judgment exonerating Argonaut and Midland from any accountability to Harbor or to Central National. From this judgment Harbor and Central National now appeal.

## DISCUSSION

The issue before the trial court and now this court is whether Argonaut's or Midland's policies provided coverage for A.J.'s liability and defense in Ver Halen's action for malicious prosecution.     The trial court resolved this question in the negative by applying a blanket ruling that the "occurrence" of malicious prosecution, for insurance purposes, transpires upon favorable termination of the malicious action. In so determining the matter, the court unnecessarily and overbroadly fashioned a general "occurrence" rule of coverage, rather than focusing, as it should have, upon the particular language of the policies involved.[3] Depending upon the wording of the particular policy, the significance and meaning of an "occur-

---

[2]In addition, Harbor's antagonists asserted by way of defense that any obligation to indemnify A.J. for malicious prosecution would contravene Insurance Code section 533, which discharges an insurer from accountability for a "wilful act" of its insured. This claim of exemption from a risk which the insurers had expressly assumed by their policies was not determined by the trial court, and has not been raised by respondents here. We express no opinion thereon.

[3]In so proceeding, the trial court responded to the uniform—and equally erroneous—insistence of all parties, in their initial motions for summary judgment, that their responsibility *vel non* could and should be determined as a matter of law by fashioning a general rule as to when insurance coverage of malicious prosecution arises. This deficiency afflicts the parties' presentation before this court as well; the briefs include virtually no analysis of the language of respondents' policies.

rence" as regards the scope of policy coverage may vary widely. (Compare *Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84 [295 P.2d 19, 57 A.L.R.2d 1379] ("occurrence" defined as accident resulting in injury during the policy period; coverage commenced upon injury, not injury-producing act) with *Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409 [149 Cal.Rptr. 292, 583 P.2d 1335] ("occurrence," within policy period, covered but not defined; policy covered act within policy period producing injury after policy expiration).) A general rule as to the timing of "the occurrence" hence may not be responsive to the particular question of a given policy's coverage. Indeed, in this case several of the policies in question did not even use the term "occurrence" in defining their temporal scope of coverage for malicious prosecution. ■ ■ ■ ■ ■ Accordingly, rather than continuing the unproductive pursuit of a rule governing all cases, we consider instead the language of the policies themselves.[4]

### 1. *The Argonaut Policies.*

■ Argonaut provided primary coverage to A.J. through four successive policies. In each the relevant language was identical: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called 'personal injury') sustained by any person or organization and arising out of one or more of the following offenses committed in conduct of the named insured's business. Group A—false arrest, detention or imprisonment, or malicious prosecution . . . *if such offense is committed during the policy period* within the United States of America . . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury . . . ." (Italics added.) The inquiry evoked by this language is when the "offense" of malicious prosecution is "committed," a question similar to that of the "timing of occurrence" contested by the parties below. Argonaut contends that this event occurs either upon commencement of the malicious action or upon its favorable termination in favor of the defendant; in either case, Argonaut would not be responsible, because here both events fell outside its policy period. To avoid this result, appellants contend that the offense of malicious prosecution is a "continuing occurrence" which is "committed" throughout prosecution of the malicious action, here including the period of Argonaut's policies. While we disagree with the trial court's conclusion that the occasion of

---

[4]The interpretation of the policies is a question of law, which we assess independent of the trial court's determination. (E.g., *Economy Lumber Co.* v. *Insurance Co. of North America* (1984) 157 Cal.App.3d 641, 645 [204 Cal.Rptr. 135].)

favorable termination controls, we also find appellants' position unsound; we conclude, rather, that the "offense" of malicious prosecution is "committed" upon institution of the malicious action against the defendant. ■ Accordingly, the trial court's decision exonerating Argonaut from responsibility, although rendered on an incorrect premise, will be affirmed because legally proper. (See *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

■ Although no California case has heretofore addressed the question, in recent years the highest courts of two other jurisdictions, together with a federal district court, have construed insurance policy coverage clauses identical to Argonaut's as applicable to malicious prosecution and have uniformly concluded that commencement of the malicious action signals "commission" of that "offense." (*Paterson Tallow Co.* v. *Royal Globe Ins. Co.* (1982) 89 N.J. 24 [444 A.2d 579]; *S. Freedman & Sons* v. *Hartford Fire Ins. Co.* (D.C.App. 1978) 396 A.2d 195; *Southern Md. Agr. Ass'n* v. *Bituminous Cas. Corp.* (D.Md. 1982) 539 F.Supp. 1295.) We agree with these decisions that the gist of the tort is committed when the malicious action is commenced and the defendant is subjected to process or other injurious impact by the action.[5]

■ The elements of a cause of action for malicious prosecution are (1) the institution of an action (2) without probable cause and (3) with malice, (4) termination of the action favorable to the defendant, and (5) resulting damage by way of attorneys' fees incurred in defense, mental distress, and/or injury to reputation or social standing. (See, e.g., *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50-51 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) ■ Four of these five elements—excepting alone favorable termination—arise upon commencement of the malicious action, or at least no later than when the targeted defendant receives notice of its pendency, by service of process or otherwise. While the final element of favorable termination may—as here—occur years thereafter, that element actually is not a part of the wrong committed by the prosecuting plaintiff.

---

[5]We note that each of these out-of-state cases involved a claim of malicious prosecution of criminal proceedings, whereas two other foreign decisions, involving malicious prosecution of civil actions, have held that favorable termination rather than commencement of the malicious action is the touchstone date for insurance coverage. (*Roess* v. *St. Paul Fire & Marine Insurance Company* (M.D.Fla. 1974) 383 F.Supp. 1231; *Sec. Mut. Cas. Co.* v. *Harbor Ins. Co.* (1978) 65 Ill.App.3d 198 [21 Ill.Dec. 707, 382 N.E.2d 1], revd. on other grounds (1979) 77 Ill.2d 446 [34 Ill.Dec. 167, 397 N.E.2d 839].) These distinguishing elements do not affect our conclusion. We discuss in the text our independent reasons for determining that the offense of malicious prosecution of a civil action is committed not upon favorable termination but rather at the commencement of the malicious action. We find the reasoning of the contrary foreign decisions unpersuasive.

Rather, the requirement of favorable termination constitutes a precondition for the cause of action because the defendant's success in the malicious action refutes a presumption of probable cause that would otherwise appertain. In addition, the requirement serves practical concerns of judicial economy, by forestalling unnecessary and unfounded actions and by facilitating proof of the remaining elements of the tort. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 845-847 [92 Cal.Rptr. 179, 479 P.2d 379].) Although favorable termination thus serves to confirm the element of lack of probable cause, the focus of the wrong is upon the institution of the suit, with malice and without such probable cause. The cause of action does not accrue until favorable termination of the malicious action (*id.,* at p. 846) but from both the tortfeasor's and the victim's standpoint the "offense" is "committed" upon initial prosecution of that action. At that point the tortfeasor has invoked the judicial process against the victim maliciously and without probable cause, and the victim has thereby suffered damage.

We note, moreover, that our Supreme Court has explicated the rationale for the tort of malicious prosecution as deriving from harm to both the defendant and the administration of justice occasioned by "[t]he malicious *commencement* of a civil proceeding." (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 50 (italics added); see also *id.,* at pp. 51-53; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 242, p. 2522 (". . . the tort of malicious prosecution . . . consists of initiating or procuring the arrest and prosecution of another under lawful process, but from malicious motives and without probable cause" (italics omitted)); *id.,* § 255, p. 2531 ("The malicious institution of a civil proceeding is a tort.")))

We therefore conclude that the most reasonable, natural, and logical construction of the Argonaut policies' reference to coverage of an "offense committed during the policy period" as regards malicious prosecution is that the policies did not cover A.J.'s malicious prosecution of a malicious action which was filed and activated before Argonaut's policies went into effect. By contrast, appellants' argument that the tort of malicious prosecution must be deemed to be "committed" continuously while the malicious action is pending because that action continues to cause damage until finally terminated reflects a theoretical misunderstanding of the elements of the tort. Although continued proceedings after commencement of the action will increase and aggravate the defendant's damages, the initial wrong and consequent harm have been committed upon commencement of the action and initial impact thereof on the defendant. The New Jersey Supreme Court cogently addressed this point as follows: "While the continuation of wrongfully initiated civil proceedings may be a factor in assessing the damages that accompany the maliciously prosecuted defendant's case, it certainly can

have no bearing on the existence *vel non* of that person's cause of action in tort. Damages may begin to flow immediately upon the filing of the malicious civil complaint, assuming plaintiff can demonstrate some 'special grievance' resulting from the maliciously instituted proceedings." *(Paterson Tallow Co.* v. *Royal Globe Ins. Co., supra,* 89 N.J. 24, —, fn. 3 [444 A.2d 579, 584].)[6]

Appellants also contend that our decision in *California Union Ins. Co.* v. *Landmark Ins. Co.* (1983) 145 Cal.App.3d 462 [193 Cal.Rptr. 461] requires imposition of responsibility for malicious prosecution upon all insurers of the tortfeasor during the pendency of the malicious action. We disagree. *California Union* is entirely distinguishable. It involved the application of insurance policies containing coverage provisions different from Argonaut's to a different tort (negligent construction of a swimming pool resulting in leakage and subsurface erosion) which had caused damages extending over two insurers' successive policy periods. Our exposition there of the concept of a "continuing occurrence" involved a holding that the *first* insurer, who had been "on the risk" when the negligent act was committed and the initial damage was suffered, was responsible not only for that damage but also for the damages that accrued after its policy expired. *(Id.,* at pp. 473-476.) And although we also held the second insurer jointly responsible for the damage which occurred during *its* policy period *(id.,* at pp. 476-478), that holding arose from the distinct circumstances of the case, including the terms of the policy and the nature of the tort. Here, both of these relevant factors differ from those in *California Union,* and as discussed above both militate against application of Argonaut's policy.[7] Although the trial court's rationale for exonerating Argonaut from joint responsibility for defense and indemnification of A.J. was unsound, its conclusion and judgment as to Argonaut were correct.

■ 2. *The Midland Policies.*

By two successive policies, Midland provided excess insurance coverage to A.J., for much of the period of Argonaut's primary coverage. Midland's

---

[6]Indeed, we note that appellants themselves, in the portion of their brief contending for adoption of the "continuing occurrence" concept, articulately express the same contrary recognition: "Malicious prosecution provides redress for damages which arise out of the institution of a groundless action; these damages include loss of time, loss of reputation and character, mental suffering and defense costs. [Citation.] These damages clearly arise when the legal machinery of the state is invoked against the complaining party." (Appellants' opening brief, p. 30.)

[7]The same factors also distinguish *American Star Ins. Co.* v. *American Employers' Ins. Co.**(Cal.App.), in which *California Union* was followed on closely similar facts.

*Reporter's Note: Deleted on direction of the Supreme Court by order dated May 16, 1985.

two policies, each in force for a one-year term, respectively contained different sets of provisions concerning the temporal and substantive scope of coverage. We consider each separately.

The Midland policy that was in effect between April 1, 1974 and April 1, 1975 provided in relevant part as follows:

"COVERAGE. The Company hereby agrees to indemnify the Insured against such ultimate net loss in excess of the Insured's primary limit as the Insured sustains by reason of liability, imposed upon the Insured by law or assumed by the Insured under contract, for damages because of personal injury or property damage to which this policy applies, caused by an occurrence anywhere in the world.

"DEFENSE. If no other insurer has the right and duty to do so, the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury or property damage . . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"DEFINITIONS. When used in this policy (including endorsements forming a part hereof):

" . . . . . . . . . . . . . . . . . . . . . . .

"(c) 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured. . . .

"(d) 'personal injury' means bodily injury, including death at any time resulting therefrom, mental injury, mental anguish, shock, sickness, disease, or disability; *injury arising out of* false arrest, false imprisonment, wrongful eviction, detention, *malicious prosecution,* humiliation, libel, slander, defamation of character, or invasion of rights of privacy, *which occurs during the policy period.* The term 'personal injury' shall also include, when committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast during the policy period, and arising out of the Named Insured's advertising activities, injury arising out of: (1) infringement of copyright or of title or of slogan, and (2) piracy or unfair competition or idea misappropriation under an implied contract;

"(e) 'property damage' means (1) physical injury to or destruction of tangible property, which occurs during the policy period, including loss of

use thereof at any time resulting therefrom; or (2) loss of use of tangible property, which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period; . . ." (Italics added.)

Although these provisions do employ the defined term "occurrence," the nature and extent of coverage for malicious prosecution is not limited or specified by that reference.[8] Rather, the critical language appears in the definition of "personal injury." There, the "personal injury . . . to which this policy applies" referred to in the coverage clause is defined as including "injury arising out of . . . malicious prosecution . . . *which occurs during the policy period.* . . ." (Italics added.) The limiting clause "which occurs during the policy period" could be read as modifying and relating to either "malicious prosecution" or the entire phrase "injury arising out of . . . malicious prosecution." The latter construction would mean that the policy's coverage extended to injury caused by malicious prosecution that itself had "occurred" before the policy went into effect. We are convinced, however, that the correct construction of the policy-period limitation is that it relates to the malicious prosecution itself, not the injury resulting therefrom, and hence that this policy did not extend to A.J.'s malicious prosecution, which occurred before the policy period.

A number of considerations consistently lead to the conclusion that the policy's temporal limitation attaches coverage to "malicious prosecution within the policy period," not "injuries within the policy period." First, under traditional rules of grammar and usage the antecedent to the modifying clause here comprises the immediately preceding list of torts (including malicious prosecution). Second, the policy's other temporal limitation clauses, quoted above, all refer to tortious or injury-producing conduct occurring within the policy period, not to injuries then suffered. Thus, the "personal injury" definition's reference to covered injury arising out of infringement of copyright and the like is limited to those injuries having their origin in publications or broadcasts during the policy period. Similarly, the two covered components of "property damage" comprise direct physical damage to property "during the policy period" and loss of use of property, not physically damaged, which is "caused by an occurrence during the policy period." In all of these cases Midland's intent clearly was to provide coverage only for injuries suffered from acts committed during the

---

[8] The policy's definition of an "occurrence" as "an accident, etc." does not exclude malicious prosecution, damages from which are expressly covered by the definition of "personal injuries." It has previously been held that malicious prosecution constitutes an "accident" within the terms of a liability insurance policy. (*Maxon* v. *Security Ins. Co.* (1963) 214 Cal.App.2d 603, 611-614 [29 Cal.Rptr. 586].)

policy term. We find it inescapable that the same range of coverage was intended by the temporal limitation in question.

This reading of the policy consistently and traditionally conditions coverage upon wrongful conduct being committed while the policy is in effect. A contrary interpretation would evince the unrealistic and unreasonable proposition that Midland intended to assume responsibility for elements of damage arising, during the term of its policy, from previously committed tortious acts. Under that interpretation, presumably, a tortfeasor could purchase a policy such as this after committing the tort and thereby enjoy excess coverage for its yet-to-be unfolded consequences. An interpretation of the policy to this effect would be entirely unreasonable, and cannot be reached as being within the "reasonable expectations of the insured."

Since this policy limited its coverage to malicious prosecution which occurred during the policy period, the remaining question is whether the instant incident of malicious prosecution, involving a malicious action commenced before the policy period, but further prosecuted during that period, "occurred" therein. For the reasons discussed above with reference to Argonaut's policies, we hold that the tort did not "occur" within the period of Midland's policy but rather "occurred" beforehand, upon commencement of the malicious action. Midland therefore was not obligated under this policy to defend or indemnify A.J.

■ Midland's other policy, in effect for the year preceding the one just discussed, referred differently to the extent of coverage for malicious prosecution. The relevant provisions read:

"COVERAGE. The Company hereby agrees . . . to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability . . . for damages . . . and expenses . . . on account of:

"(1) personal injuries . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"caused by or arising out of each occurrence happening anywhere in the world.

" . . . . . . . . . . . . . . . . . . . . . . . .

"THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:

"...  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"2. . . . . The term 'personal injuries' means bodily injury, mental injury, shock, sickness, disease, disability, eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities.

"3. . . . . The term 'property damage' means direct injury to or destruction of tangible property, including the loss of use resulting therefrom.

"...  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"5. The term 'occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."

These provisions at first glance appear uncertain and somewhat self-contradictory as to whether the policy covers liability for malicious prosecution at all. The initial coverage provision effects coverage for liability for "personal injuries . . . arising out of [an] occurrence," and "personal injuries," as thereafter defined, specifically include malicious prosecution. However, "occurrence" then is defined as an accident which, during the policy period, results not in *personal* injury but in *bodily* injury or property damage. Since malicious prosecution does not ordinarily cause bodily injury as that term is commonly understood, or property damage as that term is defined in this policy, the "occurrences" referred to in the coverage clause would not literally appear to include malicious prosecution.

We believe, however, that use of the phrase "bodily injury or property damage" rather than "personal injuries or property damage" in the definition of covered "occurrences" must be deemed an oversight, and that the definition actually must be read as referring to "personal injuries" instead of "bodily injury." Otherwise, not only malicious prosecution but indeed almost all of the "personal injuries" specified and defined for coverage purposes would be excluded from coverage. The settled rules that doubtful policy obligations, and ambiguities therein, must be construed against the insurer and in favor of coverage (e.g., *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]) require that we avoid such a self-defeating construction of the policy.

■ So construed, however, the policy yet remains limited in coverage to "occurrences" which result in personal injury (here, i.e., malicious pros-

ecution), or property damage, within the policy period. The upshot of this "occurrence" limitation is that the instant incident of malicious prosecution was not subject to this policy. As discussed above, A.J.'s malicious prosecution "occurred" before the policy term began, when the malicious action was commenced against Ver Halen in 1971. The gist of the wrong then was inflicted and complete. Once again, therefore, the trial court's judgment to the effect that Midland did not provide coverage for A.J.'s malicious prosecution, although based upon an erroneous view as to the time of the "occurrence," was legally correct.

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Hanson (Thaxton), J., concurred.

The petition for a rehearing was denied April 18, 1985, and appellants' petition for review by the Supreme Court was denied June 6, 1985. Bird, C. J., did not participate therein.