[No. A062499. First Dist., Div. One. Dec. 9, 1994.]

AMERICAN CYANAMID COMPANY, Plaintiff and Appellant, v. AMERICAN HOME ASSURANCE COMPANY et al., Defendants and Respondents

970

## COUNSEL

Heller, Ehrman, White & McAuliffe, Barry S. Levin, David B. Goodwin and Daniel J. Kroll for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, Sharon S. Chandler, Donald E. Brier, Roger S. Raphael, Long & Levit, Ronald E. Mallen, David W. Evans, Bishop, Barry, Howe, Haney & Ryder and Nelson C. Barry, Sr., for Defendants and Respondents.

## OPINION

**DOSSEE, J.**—This is an action for declaratory relief brought by an insured, American Cyanamid Company, to determine the duty of its various insurers to defend and indemnify American Cyanamid in an underlying lawsuit for anticompetitive conduct. The action was brought against three primary insurers and numerous excess insurers, all of whose policies were in effect from 1966 to 1986.

The three primary insurers—Insurance Company of North America (INA), American Home Assurance Company (AHA) and Commercial Union (CU) —moved for summary adjudication of the duty to defend. The trial court granted the motion, finding no duty to defend.[1] Plaintiff, American Cyanamid, appeals.

### FACTS

*The Underlying Lawsuit*

American Cyanamid is a research-based biotechnology and chemical company which since 1967 has developed, manufactured and sold "chemical light products," e.g., chemical lightsticks, safety lights, light wands and other products used especially by the United States military.

---

[1]After the trial court ruled on the motion of the primary insurers, plaintiff dismissed the action as to the excess insurers. Plaintiff stipulated that in light of the trial court's ruling the primary insurers would be entitled to summary judgment, and plaintiff agreed to entry of judgment in favor of the primary insurers subject to plaintiff's right to appeal. Judgment was entered accordingly.

Chemical Device Corp. (CDC) is also in the business of manufacturing and selling chemical light products, but it has been in existence only since January 1986.

In 1989 CDC filed suit in federal court against American Cyanamid seeking damages for CDC's loss of business resulting from American Cyanamid's monopolistic and anticompetitive conduct. CDC's complaint alleged two broad courses of conduct by American Cyanamid—one from 1967 to 1986 and the second from 1986 to the present. The pivotal date, 1986, was the date CDC itself entered the market for chemical light products.

Because the insurance coverage action before us pertains only to insurance policies in effect before 1986, the allegations in the underlying lawsuit of most interest are those concerning American Cyanamid's pre-1986 conduct. In essence, the complaint alleges that American Cyanamid abused its patents in an effort to restrict competition and monopolize the market. Specifically, the complaint alleges that American Cyanamid developed certain chemical light products with funding from the United States Government pursuant to research and development contracts. These contracts required American Cyanamid to grant to the government a royalty-free license for its inventions and, further, to disclose in its patent applications, and in any resulting patents, that the patent was the result of a government-funded research and development contract. The purpose of this disclosure was to make competing suppliers aware of the government's royalty-free license and to enable the government to purchase chemical light products from those suppliers without being exposed to patent infringement claims.

The complaint further alleges that from 1972 to 1986 American Cyanamid failed to make the requisite disclosure on its patent applications and thus failed to provide the government with a royalty-free license for its inventions. As a result, the government and potential competitors were led to believe that potential competitors would infringe American Cyanamid's patents if they manufactured and sold chemical light products to the government. American Cyanamid thereby created a monopoly in the government market for chemical light products.

As to the post-1986 conduct, the complaint alleges that in February 1986 CDC submitted a bid to the United States Government's buying agent for the military services and thereby presented the first competition for the sale of chemical light products to the government. American Cyanamid thereupon engaged in a variety of activities designed to destroy the competition and perpetuate its monopoly over the market.

Although CDC's complaint raises several legal theories, rulings by the federal district court upon motions by the parties narrowed the claims of CDC to (1) a claim for monopolization in violation of section 2 of the Sherman Act and (2) state claims for theft of trade secrets, unfair competition and intentional interference with contractual relations.

*The Insurance Policies*

American Cyanamid was insured under eight separate primary policies during the period from 1966 to 1986. Although the liability policies are all worded differently, all provide coverage for damages the insured must pay for "advertising injury," which is defined to include damage resulting from, among other things, unfair competition. The dispute here concerns timing: whether the pre-1986 policies provide coverage even though the injury to CDC did not occur (and indeed could not have occurred as CDC did not even exist) until after the policies had expired.

*The Insurance Coverage Action*

In its action for declaratory relief American Cyanamid alleged that the pre-1986 insurance policies provided coverage for the CDC lawsuit because that lawsuit was based on "acts or offenses occurring throughout the [policy] periods." It was American Cyanamid's position that coverage was triggered by the alleged anticompetitive conduct during the policy periods.

In their motion for summary adjudication, the primary insurers did not directly raise the issue of when the insurance coverage was triggered. Instead, the insurers asserted that the "offense" of unfair competition could not have been committed before 1986 as CDC did not exist as a competitor.

For purposes of the motion, American Cyanamid and the primary insurers stipulated to certain facts, including the following: "CDC was incorporated on or about January 28, 1986. CDC makes no claim in the Underlying Litigation that it was either in business or otherwise in competition with plaintiff Cyanamid prior to January of 1986." The parties also stipulated that the sole issue to be adjudicated was the following: "Does the fact that CDC did not exist as a competitor of American Cyanamid prior to January 28, 1986 preclude a duty to defend American Cyanamid in the underlying litigation under the advertising injury liability provisions of each of the primary policies at issue?"

The trial court concluded as follows: "The Court finds that the fact that CDC did not exist as a competitor of American Cyanamid prior to January

28, 1986 precludes a duty on the part of the Primary Insurers to defend American Cyanamid in the underlying litigation under the advertising liability provision of the primary policies at issue. Absent the existence of a competitor there is no duty to defend an allegation of unfair competition."

## DISCUSSION

There is no question that an insurer is not required to defend an action where undisputed facts conclusively show that the underlying conduct is not within the coverage of the policy. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 298 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) In *Montrose*, the court reiterated that on a motion for summary judgment seeking a declaration of the nonexistence of a duty to defend, the insurer must establish the absence of any potential for coverage. (6 Cal.4th at p. 300.) If the parties dispute whether the insured's alleged misconduct is potentially within the policy coverage, and if the evidence submitted does not permit the court to eliminate either party's view, then factual issues exist precluding summary judgment in the insurer's favor. Indeed, "the duty to defend is then *established*, absent additional evidence bearing on the issue." (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1085 [17 Cal.Rptr.2d 210, 846 P.2d 792]; accord, *Montrose, supra,* 6 Cal.4th at p. 301.)

### A. *Nature of Underlying Claim*

At the outset, a brief discussion seems necessary on the nature of CDC's claim. As noted, CDC's complaint asserts, among other things, that American Cyanamid monopolized the market in violation of section 2 of the Sherman Act and that American Cyanamid's course of conduct "constitutes unfair competition within the meaning of Section 17200 et seq. of California's Business and Professions Code . . . ."

In *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545], the Supreme Court construed the term "unfair competition" within a liability insurance policy and held that it does not refer to conduct prohibited by the Unfair Business Practices Act (Bus. & Prof. Code, § 17200 et seq.). The court drew a distinction between the common law tort of unfair competition and the statutory definition. (2 Cal.4th at pp. 1263-1264.) The court reasoned that the liability policy covers *damages* caused by unfair competition but damages are not available under the Unfair Business Practices Act. (2 Cal.4th at pp. 1265-1266.)

It is clear, then, that CDC's claim for unfair competition, as pleaded, is not covered. CDC's complaint alleges a violation of the Unfair Business

Practices Act. ■ However, it is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a *potential* for indemnity. (*Horace Mann Ins. Co.* v. *Barbara B.*, *supra*, 4 Cal.4th 1076, 1081; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168].) The insurer's duty is not measured by the technical legal cause of action pleaded in the underlying third party complaint but rather by the potential for liability under the policy's coverage as revealed by the facts alleged in the complaint or otherwise known to the insured. (*Gray, supra*, 65 Cal.2d at pp. 275-277; see also *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 606-607 [222 Cal.Rptr. 276].)

Thus, the question is whether the *facts* of the underlying lawsuit amount to a claim for "unfair competition." That issue was not presented to the trial court, nor do we decide it here.[2] By stipulation, the parties obtained a ruling only on the question whether the nonexistence of CDC as a competitor precludes coverage. The parties agreed that if the trial court ruled against the insurers on that question further litigation would be necessary on whether there is a duty to defend. For purposes of our discussion, we will assume that the underlying facts constitute a claim for unfair competition.[3]

### B. *Competitive Injury*

■ Historically, the common law tort of "unfair competition" was a remedy for injury to a business rival. The cornerstone of the tort was misappropriation of another's commercial advantage: misappropriation by

---

[2]Nor do we decide whether American Cyanamid's alleged anticompetitive conduct, its failure to make the required disclosures in its patent applications and resulting patents, constitutes "advertising activities" so as to give rise to insurance coverage for advertising injury arising out of the insured's "advertising activities." That issue was neither raised below nor argued on appeal.

[3]We note that in *Bank of the West* v. *Superior Court, supra*, 2 Cal.4th 1254, the Supreme Court left unanswered the question whether coverage for unfair competition is narrowly limited to the common law tort of unfair competition or whether it extends to other anticompetitive business practices as long as damages are available. (See *Pacific Group* v. *First State Ins. Co.* (N.D.Cal. 1993) 841 F.Supp. 922, 934-937 [coverage extended to claim under Hawaii deceptive practices statute for which damages may be awarded]; see also *CNA Casualty of California* v. *Seaboard Surety Co., supra*, 176 Cal.App.3d 598 [claim of anticompetitive conduct potentially fell within coverage for unfair competition]; *Tews Funeral Home, Inc.* v. *Ohio Cas. Ins. Co.* (7th Cir. 1987) 832 F.2d 1037, 1043-1044 [antitrust claim potentially covered as claim for defamation or unfair competition]; *Ruder & Finn, Inc.* v. *Seaboard Sur. Co.* (1981) 52 N.Y.2d 663 [439 N.Y.S.2d 858, 422 N.E.2d 518, 522-523] [antitrust claim could qualify as claim for disparagement, which is covered]; contra, *Curtis Universal* v. *Sheboygan Emergency Med. Serv.* (E.D.Wis. 1994) 844 F.Supp. 492, 498-499 [antitrust claim would not be reshaped into claim for unfair competition].)

one business of the "organization [or] expenditure of labor, skill, and money" of another. (*Internat'l News Service* v. *Asso. Press* (1918) 248 U.S. 215, 239 [63 L.Ed. 211, 221, 39 S.Ct. 68, 2 A.L.R. 293].) As the Supreme Court explained in *Bank of the West*, modern day statutes prohibiting unfair business practices expanded protection to consumers, not just business competitors. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, 1264; see also *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 110 [101 Cal.Rptr. 745, 496 P.2d 817]; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 927 [162 Cal.Rptr. 194].) In *Bank of the West*, the Supreme Court held that a liability insurance policy analogous to the policies at issue here, covering damages for advertising injury arising from unfair competition, did not provide coverage for claims asserted by *consumers* in a lawsuit brought under state statute prohibiting unfair business practices. Coverage is available only when there is a claim of competitive injury. (2 Cal.4th at pp. 1262-1264; see also *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1151 [29 Cal.Rptr.2d 559]; *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App. 4th 846, 865 [13 Cal.Rptr.2d 318].)

Indeed, courts of other jurisdictions have held there is no duty to defend an underlying lawsuit for unfair competition absent the element of competition or rivalry between the parties. (*Ruder & Finn, Inc.* v. *Seaboard Sur. Co., supra,* 422 N.E.2d 518; *Seaboard Sur. Co.* v. *Ralph Williams' N.W. Chrys. P., Inc.* (1973) 81 Wn.2d 740 [504 P.2d 1139]; *Boggs* v. *Whitaker, Lipp & Helea, Inc.* (1990) 56 Wn.App. 583 [784 P.2d 1273]; *In re San Juan Dupont Plaza Hotel Fire Litigation* (D.P.R. 1992) 802 F.Supp. 624, 640-642, affd. (1st Cir. 1993) 989 F.2d 36; *Tigera Group, Inc.* v. *Commerce and Industry Ins.* (N.D.Cal. 1991) 753 F.Supp. 858, 860-861; *Westfield Ins. Co.* v. *TWT, Inc.* (N.D.Cal. 1989) 723 F.Supp. 492, 496; *Globe Indem. Co.* v. *First American State Bank* (W.D.Wash. 1989) 720 F.Supp. 853, 857, affd. without opn. (9th Cir. 1990) 904 F.2d 710.)

In the present case the underlying lawsuit against American Cyanamid was brought by a competitor. CDC is not a member of the consuming public; CDC is a business rival of American Cyanamid. Thus, there is no dispute that the element of competitive injury exists. The trial court concluded, however, that there could be no coverage absent a competitive injury *during the policy period.* The court reasoned as follows: "In the case at bar, the Court is asked to determine whether the primary insurers have a duty to defend under the advertising liability provisions of each of the primary policies. *Bank of the West* controls and the Court finds that there must be a

competitor in existence before the duty to defend arises. [¶] The Supreme Court relies upon *Barquis* v. *Merchants Collection Association* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817] for the proposition that competitive injury is an element of the common law tort of unfair competition (*Bank of the West*, 2 Cal.4th at 1264). Under this common law concept, the scope of coverage for unfair competition requires a competitor. Logically, in order to have a competitive injury, there must be a competitor in existence. As thus restricted, the allegation of occurrences of unfair competition must be against an existing competitor. The allegations of the complaint are based upon Plaintiffs conduct prior to 1986. CDC did not exist during the period prior to January 1986. Therefore, the complaint cannot trigger the coverage of an advertising injury."

██ The question before this court, then, is whether the coverage is triggered only when the injury to CDC took place—an event that occurred after the policies at issue here had already expired—or whether coverage is triggered by American Cyanamid's anticompetitive activities during the policy periods even though the injury did not occur until later.

C. *Trigger of Coverage*

██ In questions of insurance coverage the court's initial focus must be upon the language of the policy itself, not upon "general" rules of coverage that are not necessarily responsive to the policy language. (*Garriott Crop Dusting Co.* v. *Superior Court* (1990) 221 Cal.App.3d 783, 790 [270 Cal.Rptr. 678]; *Harbor Ins. Co.* v. *Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1034-1035 [211 Cal.Rptr. 902]; see also *American Star Ins. Co.* v. *Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1325 [284 Cal.Rptr. 45].)

██ In the present case, the trial court mistakenly presumed that all of the policies are similarly worded and that they are triggered only by an *injury* during the policy period. In the words of the court, "The policy at issue in *Bank of West* was substantially similar to the policies before this Court. It provided that it would pay, on behalf of the insured, all sums obligated to be paid as damages because of 'advertising injury to which this insurance applies.' An advertising injury meant injury during the policy period from unfair competition."

In fact, as will be seen in the following discussion, the policies at issue here do not contain identical language, and they do not all require an injury during the policy period in order to trigger coverage. The differing wording pertaining to the trigger of coverage puts the eight policies into four groups.

### (1) *Injury During the Policy Period*

Two of the policies (INA policy No. LAB 1263, July 31, 1971-Nov. 7, 1974, and CU policy No. CLCY 9883-002, Nov. 7, 1974-Jan. 1, 1976) cover personal injury, property damage, or advertising injury caused by an occurrence, and "occurrence" is defined as "an injurious exposure to conditions, which results during the policy period, in personal injury, advertising injury or property damage . . . ." As to these two policies, the trial court correctly found the triggering event to be an injury during the policy period.

■ The general rule, articulated early on in *Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84 [295 P.2d 19, 57 A.L.R.2d 1379], for construing policies covering an accident or occurrence which results in injury during the policy period is that coverage is triggered when the complaining party was actually damaged, not when the wrongful act was committed. (See also *Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1018-1019 [247 Cal.Rptr. 638]; *State Farm Mut. Auto. Ins. Co.* v. *Longden* (1987) 197 Cal.App.3d 226, 231 [242 Cal.Rptr. 726]; *Schrillo Co.* v. *Hartford Accident & Indemnity Co.* (1986) 181 Cal.App.3d 766, 773 [226 Cal.Rptr. 717].)

Thus, for example, in *Schrillo Co.* v. *Hartford Accident & Indemnity Co., supra,* 181 Cal.App.3d 766, the insured manufactured power steering units from 1972 until early 1975. In May 1975 one of its units was installed in the truck of Larry Senger, and in 1977 Mr. Senger was injured when his truck crashed after a lockup of the power steering unit. Mr. Senger sued Schrillo claiming negligence in the manufacture of the power steering unit and Schrillo tendered the defense to Hartford, whose policy covered the period from May 1973 to April 1975. The trial court granted Hartford's motion for summary judgment, finding no duty to defend or indemnify as the injury occurred two years after the policy had expired. The Court of Appeal affirmed: "In sum, the Hartford insurance policy evinces the mutual understanding and agreement of the parties that the risk taken by Hartford was limited to those instances in which the injuries claimed occurred during the policy period. In the case at bench, it is uncontradicted that the 'accident' which was the basis for the Senger action 'occurred' on May 15, 1977, over two years following the expiration of the Hartford policy coverage (April 17, 1975). Moreover, the power steering unit which allegedly caused the injuries was shipped on approximately May 21, 1975, over a month after the expiration of the Hartford policy coverage." (181 Cal.App.3d at p. 776.)

■ In the present case, the INA and CU occurrence policies similarly provide coverage for advertising *injury* occurring during the policy period.

The claimed injury to CDC could not have occurred during the policy periods (1971-1974 and 1974-1976) as CDC was not even in existence. We therefore conclude the trial court was correct in finding neither policy provided coverage and neither insurer had a duty to defend.

### (2) Events During the Policy Period

The foregoing general rule concerning the trigger of coverage of an occurrence policy is not applicable when the policy language differs from the language construed in *Remmer* and its progeny. (*Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 411-412 [149 Cal.Rptr. 292, 583 P.2d 1335].) In *Sam Harris*, the policy applied to "occurrences or accidents which happen during the policy period." Neither "occurrences" nor "accidents" was defined. The Supreme Court found this language distinguishable from the language in policies defining "occurrence" to mean an event causing injury during the policy period.

In *Sam Harris*, the Supreme Court construed the term "occurrence" in accordance with its dictionary definition to mean simply something that happens during the policy period. In that case the insured had sold its airplane and cancelled its policy. Soon thereafter the plane crashed and the buyer sued the insured for negligent repairs. The Supreme Court held that the policy could refer to negligent repairs performed during the policy period even though the injury resulted later. Hence, the court concluded the insurer had a duty to defend the action.

In the present case, one policy contains language similar to the language in *Sam Harris*, limiting coverage to "occurrences which happen during the policy period" but giving no definition of "occurrence." (INA policy No. LAB 1263, June 30, 1966-July 31, 1971.) As to that policy we must conclude the policy could refer to American Cyanamid's anticompetitive conduct during the policy period even though the injury to CDC resulted later. Summary adjudication should not have been granted as to this policy.

### (3) Occurrence From an Offense

Another policy is more problematic. It provides coverage for advertising injury "to which policy applies arising from an occurrence within the policy territory." (INA policy Nos. ISL 1334, ISA 1225, June 30, 1982-June 30, 1983.) As in *Sam Harris, supra,* "occurrence" is not defined, nor is there any

other temporal limitation on coverage. The occurrence need only take place "within the policy territory."[4]

Yet, unlike the policy construed above, the policy at issue here goes on to define "advertising injury" as "*injury* or damage arising out of one or more of the following offenses: . . . unfair competition . . . ." Reading the policy as a whole in its ordinary and popular sense, we uphold the trial court's interpretation of this language to mean that the triggering event is the injury, not the act. Accordingly, as no injury to CDC occurred during the policy period, the trial court correctly found no duty to defend.

### (4) *Offense Committed During Policy Period*

Four of the policies do not use the term "occurrence" in defining the temporal extent of their coverage; instead, these policies cover "offenses committed . . . during the policy period." (AHA policy No. GLA 343-11-71, Jan. 1, 1976-June 30, 1976; AHA policy No. GLA 342-93-13, June 30, 1976-June 30, 1980; INA policy Nos. ISL 1334, ISA 1225, June 30, 1980-June 30, 1982; INA policy No. ISL 1334, June 30, 1983-June 30, 1986.)[5]

Similar terminology was construed in *Harbor Ins. Co.* v. *Central National Ins. Co., supra,* 165 Cal.App.3d 1029, where the court, as in *Sam Harris,* held the general rule regarding the trigger of coverage of an occurrence policy was not applicable to policies that did not even use the term occurrence. In *Harbor Ins. Co.* the insured had been sued for malicious prosecution. Two of its policies provided coverage for damages arising from the offenses of false arrest or malicious prosecution " 'if such offense is committed during the policy period.' " (165 Cal.App.3d at p. 1035, italics omitted.) The Court of Appeal held that the offense of malicious prosecution is committed when the malicious action is instituted (not, as the trial court had found, when the action is favorably terminated.) (*Id.,* at pp. 1036-1037.) Hence, the court concluded there was no coverage under the policies which went into effect after the malicious action was filed and activated.

In holding that the offense was committed when the malicious action was filed, the court recognized that the cause of action does not accrue until

---

[4]"Policy territory" is defined as the United States of America, its territories and possessions.

[5]The policies cover "advertising injury arising out of offenses committed anywhere during the policy period," and "advertising injury" is defined to mean "injury or damage arising out of one or more of the following offenses: (1) [libel, slander, disparagement, or invasion of privacy]; (2) [copyright or trademark infringement]; (3) piracy or unfair competition or idea misappropriation . . . ."

favorable termination, but the court reasoned that "from both the tortfeasor's and the victim's standpoint the 'offense' is 'committed' upon initial prosecution of that action. At that point the tortfeasor has invoked the judicial process against the victim maliciously and without probable cause, and the victim has thereby suffered damage." (165 Cal.App.3d at p. 1037.)

Here, under the policies in question, the offense is unfair competition. The question is when the offense was committed. The insurers rely primarily on *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, in which the court noted that the common law tort of unfair competition, unlike a claim under a state statute prohibiting unfair business practices, requires a competitive injury. (*Id.,* at p. 1264.) The insurers extrapolate from this language that the tort of unfair competition is not complete until a competitor exists and has been injured; hence the "offense" could not have been committed here before 1986, before CDC came into existence.

This reasoning is flawed for several reasons. First, *Bank of the West* did not involve the issue of trigger; the question there was whether coverage for "unfair competition" extended to claims of unfair business practices which had harmed consumers, not competitors. In the present case there is no question that it was a competitor who was allegedly harmed. Second, as to the four policies under discussion here, coverage is provided for "offenses committed" during the policy period. This language indicates that the triggering event is the act, not the injury. It is the offense that must be committed during the policy period in order to trigger coverage. There is nothing in the policies to require that the resulting injury must also occur or manifest itself during the policy period.

Third, it does not logically follow from the requirement of a competitive injury that a competitor must be in existence at the same time that the anticompetitive conduct is committed. Preventing a competitor from entering the market is just as harmful as injuring the business of an established competitor. ■ Thus, one who was prepared to enter the market and intended to do so but was thwarted by another's monopolistic conduct qualifies as an injured party to sue under the Sherman Antitrust Act. (*Pennsylvania Sugar R. Co.* v. *American Sugar R. Co.* (2d Cir. 1908) 166 Fed. 254; see 4 Callman, Unfair Competition, Trademarks & Monopolies (4th ed.) § 22.03; 54 Am.Jur.2d Monopolies, etc., § 298, p. 834.) Insofar as CDC's complaint alleges that American Cyanamid's anticompetitive practices before 1986 caused injury to CDC after it was formed in 1986, the complaint alleges that an "offense" was committed during the policy periods.

■ It may well be that in the underlying action CDC will be unable to prove any actionable misconduct before 1986. In that case, American Cyanamid will have no liability before 1986 and will have no need for

insurance coverage. The merits of the underlying lawsuit, however, are not before us. Instead, we are presented with a narrow question concerning the duty to defend, a duty which arises when the underlying action *"potentially seeks damage within the coverage of the policy."* (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 275, italics in original.) An insurer may owe a duty to defend even though no damages are ultimately awarded. (*Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th 1076, 1081.)

We conclude that American Cyanamid is potentially liable to CDC for offensive practices occurring even before 1986. Accordingly, we conclude the insurers on the four "offenses committed" policies may have a duty to defend. Summary adjudication was erroneous.

In conclusion, we affirm the trial court's ruling as to those three policies providing coverage for injury during the policy period (INA policy No. LAB 1263, July 31, 1971-Nov. 7, 1974; CU policy No. CLCY 9883-002, Nov. 7, 1974-Jan. 1, 1976; INA policy Nos. ISL 1334, ISA 1225, June 30, 1982-June 30, 1983). As to the remaining five policies, however (INA policy No. LAB 1263, June 30, 1966-July 31, 1971; AHA policy No. GLA 343-11-71, Jan. 1, 1976-June 30, 1976; AHA policy No. GLA 342-93-13, June 30, 1976-June 30, 1980; INA policy Nos. ISL 1334, ISA 1225, June 30, 1980-June 30, 1982; INA policy No. ISL 1334, June 30, 1983-June 30, 1986), summary adjudication was erroneous, and the judgment is reversed. The matter is remanded for further proceedings to determine the existence or nonexistence of a duty to defend under those five policies. Each side shall bear its own costs.

Newsom, Acting P. J., and Stein, J., concurred.

A petition for a rehearing was denied January 9, 1995, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied March 2, 1995.