**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ESTATE OF C. DELORES TUCKER, by
and through William Tucker as
PERSONAL REPRESENTATIVE; and
WILLIAM TUCKER individually,
                   *Plaintiffs-Appellants,*

v.

INTERSCOPE RECORDS, INC.; DEATH
ROW RECORDS, INC.; CHARLES B.
ORTNER; PAUL, HASTINGS, JANOFSKY
& WALKER, LLP,
                   *Defendants-Appellees.*

No. 05-56045

D.C. No.
CV-99-03679-RMT

ESTATE OF C. DELORES TUCKER, by
and through William Tucker as
PERSONAL REPRESENTATIVE; and
WILLIAM TUCKER individually,
                   *Plaintiffs-Appellants,*

v.

DAVID KENNER; GEOFFREY THOMAS;
JACK PALADINO; PAUL PALADINO,
                   *Defendants-Appellees.*

No. 06-55376

D.C. No.
CV-99-06129-RMT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert M. Takasugi, District Judge, Presiding

Argued and Submitted
May 11, 2007—Pasadena, California

Filed February 8, 2008

1787

Before: John T. Noonan, Richard A. Paez, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Noonan

## COUNSEL

Richard C. Angino, Harrisburg, Pennsylvania, for the appellants.

Steven A. Marenberg, Perry M. Goldberg, & Jason Linder, Los Angeles, California, for appellees David Kenner, Geoffrey Thomas, Interscope Records, Inc., Interscope Records, Charles B. Ortner, and Paul, Hastings, Janofsky & Walker LLP. Ronald L. Leibow, Los Angeles, California, for appellee Death Row Records, Inc.

**OPINION**

PAEZ, Circuit Judge:

In these consolidated malicious prosecution cases,[1] William Tucker and the Estate of Cynthia Dolores Tucker ("the Tuckers"),[2] appeal the district court's grant of summary judgment to all defendants in both cases. In *Tucker v. Interscope*, we affirm the district court's ruling as to all defendants. In *Tucker v. Kenner*, we affirm the district court's summary judgment as to defendant Thomas; however, as to defendant Kenner we affirm the district court's ruling in part and reverse in part, and remand for trial. We also affirm the district court's grant of summary judgment as to Mr. Tucker's loss of consortium claim in both cases.

I.

Overview

In the early 1990s, Cynthia DeLores Tucker, whose history as an activist dates back to the civil rights movement of the 1950s and 1960s, became concerned with the increasing popularity of the style of hip-hop music known as "gangsta rap," particularly its appeal to African-American youth. She enlisted the support of notable entertainers including Dionne Warwick and Melba Moore to engage in lobbying and media outreach, with the goal of limiting the sale of gangsta rap to young people. Her efforts brought her head-to-head with two of the genre's most successful production and distribution

---

[1]After oral argument, we *sua sponte* consolidated the two cases on appeal.

[2]Mrs. Tucker is now deceased. In an order dated January 27, 2006, the district court granted Mr. Tucker's motion to substitute himself, as Personal Representative of the Estate of plaintiff Cynthia Delores Tucker, as party plaintiff. On January 6, 2006, this court also substituted Mr. Tucker, in his capacity as Personal Representative of the estate, as an appellant pursuant to Fed. R. App. P. 43(a).

labels: Death Row Records, Inc. and Interscope Records, Inc. After Tucker and other members of her coalition approached Suge Knight, then-CEO of Death Row, about entering into a distribution contract with the media behemoth Time Warner, Inc., Death Row and its distributor Interscope filed separate federal court actions (the "underlying litigation") against Tucker, alleging intentional interference with their exclusive contractual relationship and other related claims.

After Death Row and Interscope successfully moved for dismissal without prejudice, the Tuckers filed separate lawsuits against the two entities and their lawyers in federal district court, invoking diversity jurisdiction and charging them with malicious prosecution. Her husband William Tucker sought damages for loss of consortium as a derivative claim. Applying California law, the district court granted summary judgment in both cases based on its conclusion that the Tuckers' evidence did not create a genuine issue of fact as to whether any of the defendants had acted with malice, a necessary element of a malicious prosecution claim. The district court also dismissed Mr. Tucker's loss of consortium claim on the grounds that Mr. Tucker failed to carry his burden of production and that without a viable claim for malicious prosecution, his derivative claim failed as a matter of law.

Reviewing *de novo* the grants of summary judgment in both cases, we conclude that, on the evidentiary record before the district court, it correctly concluded—except with regard to the claim for abuse of process included in the complaint filed by Death Row's attorney David Kenner—that the Tuckers did not present sufficient evidence to defeat the motions for summary judgment on the issue of malice. We therefore affirm the summary judgment in *Tucker v. Interscope*, and affirm in part and reverse in part the district court's grant of summary judgment in *Tucker v. Kenner*. We remand for trial the Tuckers' malicious prosecution claim against Kenner to the extent that it is predicated on the abuse of process claim that he included in *Death Row v. Tucker*. As we explain

below, as to that one claim the Tuckers have raised a genuine triable issue of fact.

II.

Factual and Procedural Background

To fully understand these consolidated appeals, it is necessary to set forth the history of the two cases in some detail. Because the district court did not provide an extensive recitation of undisputed facts, we rely primarily on the parties' briefs and the record for the following factual overview, noting factual disputes where they exist and construing any ambiguities in favor of the Tuckers, as the non-moving parties.

A.   The Underlying Dispute

Mrs. Tucker was a prominent civil rights advocate who served as the first African-American Secretary of State of Pennsylvania, the first African-American chair of the National Federation of Democratic Women, and the Chair of the Democratic National Committee Black Caucus. She also co-founded and chaired the National Political Congress of Black Women, Inc. ("NPC"), a non-profit organization dedicated to promoting African-American women's education and political, economic, and cultural development.

During the early 1990s, Mrs. Tucker became troubled by the growing popularity of "gangsta rap."[3] Of particular concern to Mrs. Tucker was the genre's influence on African-American youth, who she feared would adopt the music's violent and sometimes misogynist perspectives. At the NPC's

---

[3] The *Oxford English Dictionary* (online ed. 2007) defines gangsta rap as "a style of rap music, originating in south-central Los Angeles, featuring aggressive, often misogynistic lyrics, typically centering on the violence of gang culture."

biennial meeting in 1993, Mrs. Tucker enlisted the help of well-known artists Dionne Warwick, Melba Moore, and Terri Rossi, along with lobbyist Voncier Alexander, to form an Entertainment Commission for the NPC that would support African-American entertainers, and particularly women. The Entertainment Commission adopted a three-part mission: to eliminate barriers facing African-American artists and executives; to mobilize African-American entertainers to address important issues affecting African-American communities; and to "reshap[e] and maintain[ ] positive images to preserve the dignity and heritage of our youth." From 1993 to 1995, the Entertainment Commission worked with prominent individuals in entertainment and media, along with religious leaders and lobbyists, to put pressure on music producers and distributors to halt the sale of gangsta rap to minors. Among Mrs. Tucker's more high-profile efforts in pursuit of this goal were an appearance at a 1995 Time Warner shareholder's meeting, where she offered Time Warner executives $100 to read aloud gangsta rap lyrics from albums distributed under its name, and a protest against the sale of gangsta rap albums outside a Tower Records store, for which she was arrested.

Death Row is an independent record label founded in 1991 by Suge Knight and the well-known rap artist Dr. Dre. Death Row signed extremely popular gangsta rap stars including Dr. Dre, Tupac Shakur ("Tupac"), Snoop Doggy Dogg ("Snoop"), and Danny Boy, generating enormous profit, and notoriety, for the label throughout the mid-1990s. Interscope is a general partnership that records and distributes popular music. Like Death Row, it gained success and prominence during the 1990s through the distribution and sale of gangsta rap. From 1992 to 1998, Death Row maintained an exclusive contractual relationship with Interscope, whereby Interscope was the sole distributor of Death Row's music.

In 1995, Mrs. Tucker and the Entertainment Commission began to direct their anti-gangsta rap campaign at Death Row. Knight, Death Row's outside counsel David Kenner, and

Omar Bradley, who was then the mayor of Compton, California, were invited to the NPC's biennial convention in July 1995, where they attended a meeting with Mrs. Tucker and other members of the Entertainment Commission. Some facts —including who initiated the meeting—are in dispute, but it is uncontested that this meeting occurred. According to Mrs. Tucker's deposition testimony, during the meeting she spoke with Knight about the influence of gangsta rap on African-American youth and asked him to change the violent and misogynist nature of the lyrics on the albums he produced. Mrs. Tucker testified that Knight agreed to make changes and to come back to the Entertainment Commission with a sample.

At some point shortly before or after the NPC convention, Warwick held an informal meeting with Knight, Snoop, and Danny Boy at her home in Los Angeles. According to Warwick, the group discussed removing several references to women as "bitches" and "ho's" on *Dogg Food*, an album by Tha Dogg Pound that Death Row would soon be releasing. Warwick testified at her deposition that she relayed this information to Mrs. Tucker, Alexander, and Michael Fuchs, then-CEO of Warner Music Group, an affiliate of Time Warner.

The summary judgment record contains a letter, dated August 7, 1995, printed on NPC letterhead. The letter appears to be from Knight, though it does not bear his signature. It is addressed to Mrs. Tucker in her capacity as chair of the NPC. The letter commemorates the purported details of Knight's meeting with Mrs. Tucker at the NPC convention and reads in part:

> I [Knight] hereby designate and authorize the [NPC] to negotiate an acceptable contract relationship with Time Warner Inc. regarding the production and distribution of [Death Row] music products. I hereby understand that the above arrangement is based on the fact that my company will cease and desist from

the production and distribution of misogynist, obscene and pornographic music. . . . This authorization is submitted to demonstrate my good faith in cooperating with the [NPC] in every way possible to reverse the negative trends in African-American music.

There is conflicting testimony as to the circumstances of the letter's drafting, but according to Mrs. Tucker's own testimony it was drafted in the NPC office at her request. Mrs. Tucker also testified that she "gave the final okay to it."

On August 8, 1995, another meeting took place at Warwick's house. In attendance were Warwick, Mr. Tucker, Fuchs, and Alexander. Knight was invited but did not attend. Kenner testified at his deposition that he spent that day with Knight and that Knight received several phone calls throughout the day from someone at the meeting. According to Kenner, Knight was offered $80 million and two recording studios if he would agree to break Death Row's contract with Interscope and enter into a new contract with the Warner Music Group. Warwick and Mr. Tucker each testified, when deposed, that no one at the meeting made such an offer to Knight; Warwick also testified that Knight called her that day "at least four times" to discuss problems he had with the August 7 letter.

On August 9, 1995, Kenner sent Warwick a letter on Knight's behalf, indicating that "Mr. Knight has never conveyed [the] authorization [for the NPC to negotiate a contract with Death Row and Time Warner] and to the extent that there is any misapprehension . . . Mr. Knight hereby specifically repudiates any such agreement. . . . Mr. Fuchs [sic] offer, as conveyed to Mr. Knight, of an $80,000,000 advance and to provide him with two studios if he would agree to sign directly with Time/Warner is specifically rejected."

B.   The Underlying Litigation

On August 15, 1995, Interscope filed a complaint ("*Interscope v. Tucker*") in the United States District Court for the Central District of California, charging Mrs. Tucker with inducement to breach contract, interference with contractual relations and prospective business advantage, attempting to induce breach of fiduciary duty, and unfair business practices and unfair competition. Interscope sought damages and an injunction enjoining Mrs. Tucker from attempting to induce Death Row to breach its contract, interfering with the Death Row contract, tortiously interfering with Interscope's prospective business advantage, and attempting to induce Time Warner and/or Atlantic Records to breach their fiduciary duties to Interscope.[4] The complaint listed Charles Ortner, Geoffrey Thomas, and Belinda Orem from the law firm of Paul, Hastings, Janofsky & Walker, LLP ("Paul Hastings") as attorneys for Interscope.

On August 17, 1995, Death Row filed a complaint ("*Death Row v. Tucker*") in the United States District Court for the Central District of California, naming as defendants Mrs. Tucker, the NPC, Time Warner, Inc., Warner Music Group, Inc., Fuchs, and Gerald Levin, who was then-chair of Time Warner's board of directors. The complaint charged all defendants with racketeering and/or aiding and abetting racketeering under 18 U.S.C. § 1962(b) and (c); conspiring to violate § 1962(b) and (c); conspiring to interfere with advantageous business relationships; extortion; unfair business practices; and abuse of process. The complaint also sought to enjoin all defendants from engaging in extortion, interfering with Death Row's First Amendment rights, and "any other unlawful act alleged in this complaint." Kenner was listed as counsel for Death Row.

---

[4]Atlantic was named as a nominal defendant and later dismissed on Interscope's motion.

*Interscope v. Tucker* and *Death Row v. Tucker* were assigned to the same district court judge. The district court granted Mrs. Tucker's motion for judgment on the pleadings in *Interscope v. Tucker* as to the claim for inducement to breach a contract but denied the motion as to the remaining claims. Pre-trial activity continued until June 1998, when Interscope and Death Row each filed motions for voluntary dismissal on the grounds that "Tucker is essentially judgment proof" and Interscope and Death Row no longer had a contractual relationship "for business reasons unrelated to this litigation." The district court granted the motions and dismissed both *Interscope v. Tucker* and *Death Row v. Tucker* without prejudice, over Mrs. Tucker's objection that the suits should be dismissed with prejudice.

C.   The Malicious Prosecution Litigation

Within a month of the dismissal, the Tuckers filed their complaint in *Tucker v. Interscope* in the United States District Court for the Eastern District of Pennsylvania, invoking diversity jurisdiction. The complaint charged Interscope, Death Row, Ortner, and Paul Hastings ("Interscope Defendants") with malicious use of civil proceedings, abuse of process, intentional infliction of emotional harm, common law civil conspiracy, and racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Upon Defendants' motion, the case was transferred to the Central District of California. The Tuckers later successfully moved to withdraw all but the malicious prosecution and loss of consortium claims.

The Tuckers filed their complaint in *Tucker v. Kenner* in the United States District Court for the Central District of California, naming Kenner and Thomas as defendants ("Kenner Defendants"), along with five other defendants who were subsequently dismissed, and again invoking diversity jurisdiction.[5]

---

[5]The district court and the parties relied on California law in both cases, as do we. Neither party has argued that Pennsylvania law should apply in

The *Kenner* complaint similarly raised claims for malicious prosecution and loss of consortium, in addition to abuse of process, slander, and negligent and intentional infliction of emotional distress. The district court later dismissed all but the malicious prosecution and loss of consortium claims.

After discovery, the Interscope and Kenner Defendants filed separate motions for summary judgment based on (1) an affirmative defense of unclean hands; (2) lack of favorable termination; (3) existence of probable cause; (4) lack of malice; (5) insufficient evidence of damages; and (6) no loss of consortium. The district court granted the motion on the basis of insufficient evidence of damages and no loss of consortium but declined to address the other issues on the ground that they were moot. We reversed the summary judgment rulings in both cases in an unpublished memorandum disposition. *See Tucker v. Kenner*, 85 F. App'x 610 (9th Cir. Jan. 14, 2004) (unpublished).[6] We remanded with instructions to the district court to consider the remaining grounds for summary judgment: unclean hands; lack of favorable termination; existence of probable cause; and lack of malice. *Id.* at 614.

On remand, the Interscope and Kenner Defendants again filed for summary judgment asserting: (1) an unclean hands affirmative defense; (2) lack of favorable termination; (3) no loss of consortium; and (4) existence of probable cause for the underlying claims; and (5) lack of malice.

In *Tucker v. Interscope*, the district court concluded that genuine issues of fact existed as to favorable termination and Defendants' affirmative defense of unclean hands. It con-

the Interscope case. *See C.N.R. Atkin v. Smith*, 137 F.3d 1169, 1170-71 (9th Cir. 1998) ("The district court applied California law to this dispute and neither party objected. Therefore, we consider the parties to have waived any objection to the application of California law.").

[6]We consolidated *Tucker v. Kenner* with *Tucker v. Interscope* for purposes of the appeal from the initial summary judgments.

cluded, however, that all Interscope Defendants had probable cause to pursue claims for intentional interference with contractual relationship, intentional interference with prospective business advantage, and unfair business practices and unfair competition. However, regarding Interscope, Ortner, and Paul Hastings, the district court found that genuine issues of fact existed as to whether they had probable cause to pursue the claims for inducement to breach contract and inducement to breach fiduciary duty. Regarding Death Row, the district court found that genuine issues of fact existed as to whether it had probable cause to pursue the claims for RICO violations, state law extortion, and abuse of process.

In addition, the district court concluded that the Tuckers "failed to produce any evidence to show that the Interscope Defendants acted with malice" in filing the underlying lawsuits and that Mr. Tucker's alleged injuries were insufficient to support a claim for loss of consortium. It therefore dismissed the malicious prosecution claim based on insufficient evidence of malice and dismissed the loss of consortium claim because it was alleged as a derivative claim and because Mr. Tucker's evidence was insufficient to establish a loss of consortium. The Tuckers timely appealed the district court's judgment, Case No. 05-56045.[7]

In *Tucker v. Kenner*, the district court concluded that Kenner and Thomas had probable cause to pursue the claims for intentional interference with contractual relationship, intentional interference with prospective business advantage, and unfair business practices and unfair competition. It concluded that material issues of fact remained whether Thomas had

---

[7]After the Tuckers timely appealed the district court's judgment, Case No. 05-56045, Death Row filed for bankruptcy. We granted a stay as to Death Row but allowed the Tuckers to proceed after the bankruptcy court granted their motion for relief from the automatic stay provided in 11 U.S.C. § 362(a). Although Death Row has been represented by counsel throughout the duration of this appeal, it has never filed a brief and did not make an appearance at oral argument.

probable cause to pursue the claims for inducement to breach contract and inducement to breach fiduciary duty and whether Kenner had probable cause to pursue the claim for abuse of process. The district court further concluded that material issues of fact remained as to favorable termination and Defendants' unclean hands affirmative defense.

As in *Tucker v. Interscope*, however, the district court concluded that the Tuckers "failed to produce any evidence to show that [Thomas] acted with malice" and therefore dismissed the malicious prosecution and loss of consortium claims against him. The court also dismissed the loss of consortium claim against Kenner for lack of evidence but did not address whether the Tuckers' evidence could show that Kenner acted with malice. In response to this ambiguity, Kenner filed a second motion for summary judgment on the basis of lack of malice and for clarification of the court's prior ruling. The district court's subsequent ruling determined that the malicious prosecution claim against Kenner should be dismissed because "the evidence Plaintiffs offer in addition to this finding is insufficient to show that Kenner acted with malice." Therefore, "[a] reasonable jury could not return a verdict in [the Tuckers'] favor" and summary judgment was warranted.[8] The Tuckers timely appealed this judgment as well, Case No. 06-55376.

---

[8]Judge Noonan's partial concurrence and partial dissent states that "the district court has ruled as a matter of law that Kenner lacked probable cause to bring the claim for abuse of process." Dissent at 1802. This statement is not entirely accurate. In the memorandum accompanying the district court's order the judge said two different things—stating in discussion that he "notes" that "Kenner lacked probable cause" to bring the abuse of process claim, but then on the following page concluding that "genuine issues of fact exist[ ] as to [probable cause], which preclude[ ] finding as a matter of law in his favor." *Tucker v. Kenner*, No. CV99-06129 (C.D. Cal. filed Feb. 24, 2006). This ambiguity is of no consequence to our ultimate disposition of the Tuckers' claim against Kenner. *See* discussion *infra* Part IV(C)(1).

### III.

### Jurisdiction and Standard of Review

The district court had original jurisdiction over both cases under 28 U.S.C. § 1332. Our jurisdiction over the Tuckers' timely appeals arises under § 1291. We review *de novo* a district court's grant of summary judgment. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001).

Federal rather than California procedural rules govern this diversity action. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). A defendant who moves for summary judgment bears the initial burden of proving the absence of any triable issue of fact but need not produce evidence negating elements of a claim for which the plaintiff bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A non-moving plaintiff can defeat a motion for summary judgment by producing evidence "such that a reasonable jury could return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Pursuant to Federal Rule of Civil Procedure 56(e), a non-moving plaintiff cannot "rest upon the mere allegations or denials of the adverse party's pleading" but must instead produce evidence that "set[s] forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted).

### IV.

### The Malicious Prosecution Claims

**[1]** Under California law, a malicious prosecution claim is disfavored and requires proof that the underlying litigation:

> (1)  was *commenced* by or at the direction of the defendant and was pursued to a legal termination in

his, plaintiff's, favor; (2) was *brought* without proba-
ble cause; and (3) was *initiated* with malice.

*Zamos v. Stroud*, 87 P.3d 802, 807 (Cal. 2004) (internal quo-
tation marks, citations, and alterations omitted). In addition,
the plaintiff must demonstrate "resulting damage by way of
attorneys' fees incurred in defense, mental distress, and/or
injury to reputation or social standing." *Harbor Ins. Co. v.
Cent. Nat'l Ins. Co.*, 211 Cal. Rptr. 902, 907 (Ct. App. 1985).
Because, with one exception, we conclude that the Tuckers'
evidence did not establish a genuine issue of fact as to malice,
we do not address the element of favorable termination for
Mrs. Tucker.[9] We discuss the element of probable cause to the
extent it relates to malice.

A.   The Elements of Malice and Probable Cause

"The 'malice' element of the malicious prosecution tort
relates to the subjective intent or purpose with which the
defendant acted in initiating the prior action. . . ." *Sheldon
Appel Co. v. Albert & Oliker*, 765 P.2d 498, 503 (Cal. 1989).
In *Sierra Club Found. v. Graham*, 85 Cal. Rptr. 2d 726 (Ct.
App. 1999), the California Court of Appeal explained:

> [M]alice is present when proceedings are instituted
> primarily for an improper purpose. Suits with the
> hallmark of an improper purpose are those in which:
> (1) the person initiating them does not believe that
> his claim may be held valid; (2) the proceedings are
> begun primarily because of hostility or ill will; (3)
> the proceedings are initiated solely for the purpose of
> depriving the person against whom they are initiated
> of a beneficial use of his property; (4) the proceed-

---

[9]Nor need we revisit whether Mrs. Tucker suffered damages as a result
of the underlying litigation because we determined that there were such
damages in *Tucker v. Kenner*, 85 F. App'x 610 (9th Cir. Jan. 14, 2004)
(unpublished).

ings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.

*Id.* at 739-40 (internal quotation marks, citation, and alteration omitted). Malice is usually a question of fact for the jury to determine. *See Sheldon Appel Co.*, 765 P.2d at 503. Summary judgment on the basis of lack of malice is nonetheless appropriate when there is no evidence from which a reasonable fact finder could conclude that the defendant pursued the underlying action with malice. *See Ghebreselassie v. Coleman Sec. Serv.*, 829 F.2d 892, 899 (9th Cir. 1987) (affirming summary judgment dismissal of malicious prosecution claim under California law when plaintiff could "point to no evidence from which a fact-finder could reasonably infer that the investigators or the employer lacked probable cause or that they acted with malice").

Probable cause, in contrast, is a question of law that turns on whether the underlying claim was "legally tenable, as determined on an objective basis." *Padres L.P. v. Henderson*, 8 Cal. Rptr. 3d 584, 600 (Ct. App. 2004). Whereas the element of malice focuses on the defendant's state of mind at the time he initiated the underlying litigation, probable cause:

> "is measured by the state of the defendant's *knowledge*, not by his *intent*. . . . [T]he standard applied to defendant's consciousness is external to it. The question is not whether *he* thought the facts to constitute probable cause, but whether *the court* thinks they did."

*Sheldon Appel Co.*, 765 P.2d at 508 (quoting *Dir. Gen. v. Kastenbaum*, 263 U.S. 25, 27-28 (1923)) (emphasis in *Sheldon Appel Co.*).

**[2]** The elements of malice and probable cause therefore require different showings. The probable cause inquiry is

objective, asking whether a reasonable person would have thought that the claim was legally tenable "without regard to [her] mental state." *Roberts v. Sentry Life Ins.*, 90 Cal. Rptr. 2d 408, 412 (Ct. App. 1999). The only potential factual issue for purposes of probable cause is "the state of the defendant's knowledge" at the time she initiated the underlying lawsuit. *Sheldon Appel Co.*, 765 P.2d at 507.[10] "[W]hen the state of the defendant's factual knowledge is resolved or undisputed, it is the court which decides whether such facts constitute probable cause or not." *Id.* at 508.[11]

**[3]** Malice, on the other hand, is shown through evidence of "the *subjective* mental state of the defendant in instituting the prior action." *Downey Venture v. LMI Ins. Co.*, 78 Cal. Rptr. 2d 142, 152 (Ct. App. 1998) (internal quotation marks omitted). Because the objective reasonableness of the underlying lawsuit is separate from a defendant's subjective mental state in bringing it,

> by itself, the conclusion that probable cause is absent logically tells the trier of fact nothing about the defendant's subjective state of mind. . . . [T]he presence of malice must be established by *other, additional evidence*. . . . [T]hat evidence must include proof of either actual hostility or ill will on the part

---

[10]The California Supreme Court explained in *Sheldon Appel Co.* that "when . . . there is evidence that the defendant may have known that the factual allegations on which his action depended were untrue, the jury must determine what facts the defendant knew" before the court can determine the existence of probable cause as a matter of law. *Id.* at 508.

[11]*See also id.* at 506 ("the probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted.") (rejecting *Tool Research & Eng'g Corp. v. Henigson*, 120 Cal. Rptr. 291 (Ct. App. 1975)).

of the defendant . . . to deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant.

*Id.* at 153-54 (citations and footnote omitted) (emphasis added); *see also Grindle v. Lorbeer*, 242 Cal. Rptr. 562, 565 (Ct. App. 1987) ("[I]n a given case, unreasonable behavior which could lead to a determination that there was a lack of probable cause to file, *might not provide a sufficient basis to infer malice*." (emphasis added) (internal quotation marks omitted)).

**[4]** As recently as 2002 the California Court of Appeal has emphasized that where malice must be shown, only "other, additional evidence" apart from a lack of probable cause, is sufficient. *Swat-Fame, Inc. v. Goldstein*, 101 Cal. App. 4th 613, 634 (2002) (citing *Downey Venture*, 66 Cal.App.4th at 498), *disapproved on other grounds by Zamos v. Stroud*. In *Swat-Fame*, that additional evidence was the deposition testimony of defendant Goldstein. In her testimony Goldstein admitted as true facts that she had alleged were false in her recently-filed complaint against Swat-Fame. When her complaint was dismissed, Swat-Fame brought suit for malicious prosecution. The court of appeal determined that the discord between Goldstein's two accounts, as well as her settlement tactics in the earlier litigation raised a material issue as to whether she "knowingly [brought] an action without probable cause." *Id. Swat-Fame* confirms our understanding of California law that the two elements—probable cause and malice—are not only distinct but that "a lack of probable cause, standing alone, does not support an inference of malice." *Id.*[12]

---

[12]To the contrary, the dissent's use of *Swat-Fame* to insist that a *knowing* lack of probable cause can be inferred from a mere lack of probable cause is unfounded. Such an argument—as where the dissent argues that the absence of an actual breach of contract (objective evidence of probable cause) "could allow a jury to infer that Kenner *knowingly* brought [the claim] without probable cause"—both contradicts the plain facts of that

For the reasons that follow, we conclude that—save for the abuse of process claim filed by David Kenner—the Tuckers' evidence did not create a triable issue of fact whether the Interscope or Kenner Defendants acted with malice in pursuing *Interscope v. Tucker* and *Death Row v. Tucker*. Although the Tuckers have not attempted to differentiate their evidence of malice as it relates to Interscope and Death Row as parties in the underlying litigation and to Ortner, Kenner, Thomas, and Paul Hastings as attorneys for the parties, we note that a party's malfeasance in initiating a lawsuit is not imputable to counsel. *See Zeavin v. Lee*, 186 Cal. Rptr. 545, 548 (Ct. App. 1982). Nor are claims related to continuing such a lawsuit interchangeable for parties and attorneys.[13] We therefore separately consider the two groups of defendants.

---

case and effectuates an end-run around the very distinction central to *Swat-Fame*'s analysis. *See* Dissent at 1834, 1839; *see also* Dissent at 1835 (lack of probable cause for racketeering claim evinces "hate-filled malignancy"); Dissent at 1833 (Kenner lacking probable cause for abuse of process claim would allow the jury to infer not only that Death Row lacked probable cause but also that such a circumstance could lead a jury to infer that both Kenner and Death Row held "*knowing* assertion[s]" of malice (emphasis added)). We respectfully disagree with the dissent's characterization of *Swat-Fame*.

[13]The dissent overlooks this crucial distinction and therefore misreads *Zamos v. Stroud*. The dissent offers *Zamos* for the proposition that "malice in continuing a lawsuit is as actionable as malice in originating it." Dissent at 1837. But the dissent overlooks that the holding in *Zamos* did not concern the post-filing conduct of the parties. Rather, *Zamos* held that an attorney who continues to prosecute a suit that he knows is without basis is liable for malicious prosecution where "any reasonable attorney would agree [that the case is] totally and completely without merit" as a matter of law. *Zamos*, 87 P.3d at 810. This holding is narrow. Weighing the effect of newly acquired evidence on the continued prosecution of a lawsuit is a matter peculiarly within the knowledge and competence of an attorney. It is difficult, therefore, to see how *Zamos* says anything about how the court should view Death Row's role with respect to the ad in *The Source* or Tupac's lyrics, or how *Zamos* stands for the general proposition that "malice in continuing a lawsuit is as actionable as malice in originating it."

B.   Defendants Death Row and Interscope

[5] The Tuckers first assert that they could prove malice to a jury because they have contested factual allegations made in the complaints in *Death Row v. Tucker* and *Interscope v. Tucker*. A "bare assertion that [defendants] 'fabricated' evidence" does not show malice. *Sangster v. Paetkau*, 80 Cal. Rptr. 2d 66, 75 (Ct. App. 1998); *see also* Fed. R. Civ. P. 56(e).[14] The Tuckers' evidence comprises only Mrs. Tucker's deposition testimony that the underlying cases were "lies, and that's the reason this [malicious prosecution] suit was filed," and similar statements by Mr. Tucker. These unsubstantiated assertions do not create a triable issue of fact regarding the existence of malice. Moreover, "the fact there may be *some* disputed facts relevant to the merits of the underlying action does not by itself defeat a motion for summary judgment in a malicious prosecution action." *Sangster*, 80 Cal. Rptr. 2d at 76.

[6] The Tuckers also argue that the district court erred in

---

[14]The Tuckers mistakenly rely on *Axline v. Saint John's Hospital and Health Center*, 74 Cal. Rptr. 2d 385 (Ct. App. 1998), *disapproved on other grounds by Hassan v. Mercy Am. River Hosp.*, 74 P.3d 726 (Cal. 2003), for the proposition that a malicious-prosecution plaintiff can defeat a motion for summary judgment by *alleging* that the defendant knew that the information upon which he or she based the underlying claim was false. *Axline*, however, dealt with a dismissal following the trial court's sustaining of a demurrer, the California equivalent of a motion to dismiss on the pleadings under Federal Rule of Civil Procedure 12(b)(6). *See Axline*, 74 Cal. Rptr. 2d at 387 ("When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action."). For purposes of a demurrer, California courts treat all allegations in the complaint as true. *C & H Foods Co. v. Hartford Ins. Co.*, 211 Cal. Rptr. 765, 768 (Ct. App. 1984). To defeat a summary judgment motion, by contrast, the non-moving party "may not rest upon the mere allegations or denials" in the pleadings. Fed. R. Civ. P. 56(e). The non-moving party must establish the existence of a genuine factual dispute on the basis of admissible evidence; bare allegations without evidentiary support are insufficient to survive summary judgment.

granting summary judgment on the basis of lack of malice when there were genuine issues of fact regarding the existence of probable cause for some claims brought in the underlying litigation. But the fact that the district court found triable issues of fact as to probable cause for some claims, without more, is insufficient to survive summary judgment based on lack of malice. *See Paulus v. Bob Lynch Ford Inc.*, 43 Cal. Rptr. 3d 148, 161 (Ct. App. 2006) ("Malice cannot be established simply by a showing of the absence of probable cause. . . ."); *Downey*, 78 Cal. Rptr. 2d at 153-54 (holding that underlying claim's "lack[ of] legal tenability . . . *without more*, would not . . . permit the inference [of malice]" and requiring that "the presence of malice . . . be established by other, additional evidence"). As explained above, malice requires proof of a defendant's subjective state of mind; a "conclusion that probable cause [as an objective inquiry] is absent logically tells the trier of fact nothing about the defendant's subjective state of mind." *Downey*, 78 Cal. Rptr. 2d at 153. Even if we were to agree with the dissent that probable cause was lacking for many of the claims alleged in *Death Row v. Tucker* and *Interscope v. Tucker*, the evidence provided by the Tuckers is simply not probative of the subjective intent in filing the underlying lawsuits.

In *Padres*, the Court of Appeal concluded that the plaintiff established a *prima facie* case of malice[15] because, in addition to the lack of probable cause, the defendant filed repeated actions against the plaintiff "in order to interfere with and/or derail" the plaintiff's business venture. 8 Cal. Rptr. 3d at 605. This evidence of subjective intent was *in addition to* the lack of probable cause and was sufficient to defeat summary judg-

---

[15]In *Padres* the defendant moved to strike the plaintiff's malicious prosecution claim under California Code of Civil Procedure section 425.16, commonly known as the Strategic Lawsuit Against Public Participation ("SLAPP") statute. Defeating an anti-SLAPP motion requires the plaintiff to "make a prima facie showing of facts that would be sufficient to sustain a favorable judgment under the applicable evidentiary standard." *Padres*, 8 Cal. Rptr. 3d at 594.

ment. *See id.* In *HMS Capital, Inc. v. Lawyers Title Co.*, 12 Cal. Rptr. 3d 786 (Ct. App. 2004), the court similarly found that the plaintiff had made a *prima facie* showing of malice sufficient to defeat the defendant's anti-SLAPP motion when it produced evidence that the defendant knew the underlying suit lacked any factual basis, took no depositions, and offered to accept $25,000 in exchange for dismissing the case. *Id.* at 796-97. "These facts could support a conclusion that [defendant] was simply trying to squeeze a settlement from [plaintiff] on a baseless case, and hence evidence of malice." *Id.* at 797.

The Tuckers argue that they, too, have produced evidence of malice with respect to Death Row and Interscope. Specifically, they rely on a two-page advertisement taken out in the October 1995 issue of *The Source*, a popular hip-hop magazine, which they characterize as "calling for Mrs. Tucker's elimination,"[16] and derogatory references to Mrs. Tucker in the songs "How Do U Want It" and "Wonda Why They Call U Bitch" on Tupac's 1996 album *All Eyez on Me*.[17] The Tuckers

---

[16]One page of the advertisement features in large type the words "DEATH ROW RECORDS" and promotes Snoop Dogg's latest album "Dogg Food from Tha Dogg Pound." The artists featured on the release are listed, and include Dr. Dre, Daz, and Kurupt. The facing page, in the same large type, features the words "FREEDOM FIGHTERS" and lists, in a similar fashion, the names of twelve legendary civil rights advocates, including Martin Luther King, Jr., Nelson Mandela, and Sojourner Truth. Mrs. Tucker's name appears at the bottom of the list slashed through with a red line. The page also includes a quotation from King's "I Have a Dream Speech" and a quotation by Knight, dated August 28, 1995: " 'Whether it's freedom for our people or freedom for our people to say what's on their minds the fight lives on . . .' " (ellipsis in original). Knight is identified as "CEO Death Row Records."

[17]"How Do U Want It" addresses Mrs. Tucker as a "muthafucka" and berates her because "instead of trying to help a nigga you destroy a brotha, worst than the others." In "U Wonda Why They Call U Bitch," Tupac raps, "Dear Ms. Delores [sic] Tucker, you keep stressin' me, fuckin with a motherfuckin' mind. I figured you wanted to know, you know, why we call them ho's bitches. Maybe this might help you understand. It ain't personal. It's strictly business, baby, strictly business." These lyrics were the subject of separate litigation. *See Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001); *Tucker v. MTS, Inc.*, 229 F.3d 1139 (3d Cir. 2000) (Table) (unpublished).

assert that a jury could infer from the ad and lyrics that Death Row and Interscope harbored hostility toward Mrs. Tucker and that they brought the underlying lawsuits for the improper purpose of chilling her anti-rap campaign.

**[7]** We disagree because under California law malice is shown through evidence of "the subjective mental state of the defendant *in instituting the prior action*." *Downey Venture*, 78 Cal. Rptr. 2d at 152 (internal quotation marks omitted) (emphasis added). This is not a case like *Padres*, where repeated actions were filed, or *HMS Capital* were no depositions were taken and questionable settlement tactics were pursued. Here, even assuming the Tuckers produced sufficient evidence from which a jury could connect the ad in *The Source* or Tupac's lyrics to either Interscope or Death Row,[18] such conduct occurred months after the suits were initiated and is simply not probative of either party's subjective intent in filing the underlying litigation. Placing an ad to promote Snoop Dogg's latest album, or calling out an individual in lyrics—even if done so in a shocking and degrading way— does not present any of the "hallmark[s]" of a *lawsuit* brought for an improper purpose. *See Sierra Club*, *supra*, 72 Cal. App. 4th at 1157. Nor does *Zamos* address this question.[19] On this

---

[18]The Tuckers have failed to show a factual link between the ad in *The Source* and Interscope. The ad itself is silent as to Interscope and, presumably, for Interscope to be liable the Tuckers would have to show that Interscope was directly involved in the ad, or that Interscope, as the exclusive distributor of Death Row's music, managed and controlled Death Row to the extent that Death Row was a mere agent or instrumentality of Interscope, *see Marr v. Postal Union Life Ins. Co.*, 105 P.2d 649, 654-55 (Cal. 1940) (establishing factors by which a parent corporation may be liable for the torts of a subsidiary). The Tuckers have failed to do either.

As to the derogatory references to Mrs. Tucker in *All Eyez On Me*, the fact that Death Row produced the album and that Interscope distributed it do not tie either defendant to the derogatory lyrics. No reasonable finder of fact could infer from the lyrics that Death Row or Interscope harbored malice towards Mrs. Tucker and filed the prior, underlying lawsuits for that reason.

[19]*Zamos* is the only California authority cited by the dissent for the proposition that "malice [by parties] in continuing a lawsuit is [ ] action-

record, no California authority supports, nor could any reasonable finder of fact infer, that this post-filing conduct was probative of why the parties filed *Interscope v. Tucker* and *Death Row v. Tucker*.

[8] The Tuckers next assert that a jury could infer improper purpose from the fact that Death Row and Interscope prosecuted the underlying lawsuits for three years without seeking a hearing on their claims for injunctive relief and then voluntarily dismissed the suits. In light of the Tuckers' own discovery delays, for which they were sanctioned, the mere fact that the litigation never progressed to a hearing or trial on the merits is insufficient to create a triable issue of fact regarding malice. Nor do the voluntary dismissals in *Death Row v. Tucker* and *Interscope v. Tucker* suggest that Death Row and Interscope initiated those lawsuits believing their claims to be meritless. *Cf. Sierra Club*, 85 Cal. Rptr. 2d at 740 (rejecting argument that post-dismissal settlement was "[ ]relevant to the issue of [defendant's] state of mind for purposes of the malicious prosecution"). The Tuckers produced no evidence to undermine Defendants' explanation that they dismissed *Death Row v. Tucker* and *Interscope v. Tucker* upon the termination of their contractual relationship, at which point most of the underlying claims for injunctive relief became moot and the underlying claims for damages, given that the Tuckers were judgment-proof, became futile. Nor could a jury reasonably infer that the statements in the Defendants' motions that the Tuckers were judgment-proof were somehow "window-dressing meant to disguise the absence of any fact supporting the outrageous claims asserted." Dissent at 1832. To the contrary, the California Court of Appeal has encouraged timely dismissals, noting that:

---

able." Dissent at 1837. But, the post-filing behavior at issue in *Zamos* involved an attorney who continued to prosecute a case after discovering facts demonstrating that the lawsuit had no merit. That case does not contemplate whether post-filing conduct *by the partie*s evinces malice in *initiating* the suit.

the law favors the early resolution of disputes, including voluntary dismissal of suits when the plaintiff becomes convinced he cannot prevail or otherwise chooses to forego the action. This policy would be ill-served by a rule which would virtually compel the plaintiff to continue his litigation in order to place himself in the best posture for defense of a malicious prosecution action.

*Leonardini v. Shell Oil Co.*, 264 Cal. Rptr. 883, 897-98 (Ct. App. 1989) (citation omitted).

**[9]** Finally, the Tuckers assert they can demonstrate malice on the ground that Interscope named only Mrs. Tucker (and Atlantic Ventures nominally) as a defendant. Given that the strongest evidence supporting Interscope's claims was the August 7 letter bearing Mrs. Tucker's name, the decision to name only Mrs. Tucker rather than other members of the NPC and its Entertainment Commission reflects a prudent litigation decision and is not evidence that the parties knowingly brought an action without probable cause or that they harbored especial ill will towards Mrs. Tucker.

**[10]** In sum, we agree with the district court's legal conclusion that the Tuckers did not produce sufficient evidence from which a jury could infer that either Death Row or Interscope pursued the underlying litigation out of malice.

C.  Attorney-Defendants Ortner, Thomas, Kenner, and Paul Hastings

**[11]** To show that attorney-Defendants Ortner, Thomas, Kenner, and the law firm of Paul Hastings acted with malice in pursuing the underlying litigation on behalf of their clients, the Tuckers must do more than rely on the evidence relating to Death Row and Interscope's own purposes in initiating *Death Row v. Tucker* and *Interscope v. Tucker*. *See Zeavin*, 186 Cal. Rptr. at 548 (rejecting the "argument of joint liability

of attorney and client for the conduct of each other where both are joined as defendants in a malicious prosecution action" and noting that "the client is not the agent of his attorney"); *see also Morrison v. Rudolph*, 126 Cal. Rptr. 2d 747, 752 (Ct. App. 2004) (" 'Usually, the client imparts information upon which the attorney relies in determining whether probable cause exists for initiating a proceeding. The rule is that the attorney may rely on those statements as a basis for exercising judgment and providing advice, unless the client's representations are *known* to be false.' " (quoting Mallen & Smith, *Legal Malpractice* (5th ed. 2000) § 6.19, p. 620) (emphasis added)), *disapproved of on other grounds by Zamos*, 87 P.3d at 802. To ultimately prevail against any of the attorney-Defendants, the Tuckers must show "other, additional evidence" that demonstrates the attorney's own malice or knowing lack of probable cause. *Swat-Fame*, 101 Cal. App. 4th 613 at 634 (citing *Downey Venture*, 66 Cal. App. 4th at 498); *see also Ross v. Kish*, 51 Cal. Rptr. 3d 484, 497 (Ct. App. 2006) (holding that "because the evidence suggests [the attorney-defendant] knew the claims for breach of contract and legal malpractice lacked factual and legal support[,] . . . a trier of fact reasonably could infer [the defendant-attorney] filed the action with malice").

## 1.   Kenner and the Claim for Abuse of Process

With respect to the abuse of process claim in *Death Row v. Tucker*, the Tuckers have raised a triable issue of fact under the above standard. A reasonable fact-finder could infer from Kenner's drafting of the complaint that Kenner knew the abuse of process claim lacked merit.[20] In drafting the com-

---

[20]The fact that Kenner included multiple causes of action in the complaint, some of which were pled properly on the known facts at the time of filing, does not affect our determination that Kenner's abuse of process claim raises a triable issue of fact regarding malice. Under California law, "it is not necessary that the whole proceeding be utterly groundless, for, if groundless charges are maliciously and without probable cause, coupled

plaint, Kenner alleged that Mrs. Tucker's "wrongful use of the criminal and civil justice system" was an abuse of process under California state law. The only fact in the complaint to support that allegation was that "[Suge] Knight was specifically threatened that as a result of [Tucker's] power and influence that [he] would spend the rest of his life in jail." Even if Kenner sincerely relied on his client's representations that such a threat was made by Tucker, Kenner's use of that allegation to state an abuse of process claim provides a triable issue as to whether Kenner did so with malice.

**[12]** This is because under well-established California law, the tort of abuse of process "requires misuse of a *judicial* process." *Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1822 (Ct. App. 1994). It is a process that is "pursuant to authority of [a] court." *Meadows v. Bakersfield Sav. & Loan Ass'n.*, 59 Cal. Rptr. 34, 37 (Ct. App. 1967); *see id.* ("[T]he essence of the tort 'abuse of process' lies in the misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice."); *see also* 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 517, pp.767-68. To succeed in an action for abuse of process, a litigant must establish that the defendant (1) contemplated an ulterior motive in using the judicial process, and (2) committed "a willful act in the use of th[at] process not proper in the regular conduct of the proceedings." *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 728 P.2d 1202, 1209 (Cal. 1986). Misuse of an administrative proceeding—even one that is quasi-

---

with others which are well founded, they are not on that account less injurious, and, therefore, [even one charge can] constitute a valid cause of action." *Crowley v. Katleman*, 881 P.2d 1083, 1088 (Cal. 1994) (internal quotation marks omitted); *see also Bertero v. Nat'l Gen. Corp.*, 529 P.2d 608 (Cal. 1974) (approving a jury instruction allowing the jury to find for the plaintiff in a malicious prosecution action even if only one of the three theories of liability pleaded in the underlying action lacked probable cause).

judicial—does not support a claim for abuse of process. *Stolz*, 25 Cal. App. 4th at 1823-25 (noting that there is "no authority" that extends the tort to administrative proceedings). Nor is there any authority—Kenner's citation to *Standing Committee on Discipline v. Ross* not withstanding—that threats made outside of the judicial process can form the basis for an abuse of process claim. *See Ross*, 735 F.2d 1168, 1170 (9th Cir. 1984) (threatening criminal charges to obtain an advantage in an ongoing civil action subjected lawyer to disciplinary proceedings).

**[13]** Here, in drafting the abuse of process claim, Kenner relied on vague language about "wrongful use of the criminal and civil justice system" despite clearly established law that requires misuse of a *court* process.[21] Moreover, he supported the claim with the mere factual assertion that Tucker would use her "influence" to ensure that Knight went to jail. These circumstances raise a genuine triable issue of fact as to Kenner's "*subjective* mental state . . . in instituting the [claim]." *Downey Venture*, 78 Cal. Rptr. 2d at 152. A fact-finder could reasonably infer from Kenner's drafting of the complaint that he did not believe the claim was valid when filed, or that the claim was instituted for an improper purpose.[22]

---

[21]For this reason, although Kenner invites us to affirm the district court's grant of summary judgment on the basis that he had probable cause to include the abuse of process claim in *Death Row v. Tucker*, he has utterly failed, on this record, to demonstrate that he is entitled to judgment as a matter of law. We therefore have no basis on which to affirm on this alternative ground.

[22]We also note that the only additional evidence that Kenner obtained after he filed the complaint, according to his own deposition, was that, "[Tucker] apparently did call the Justice Department, I think Janet Reno directly, and I think she called Alcohol, Tobacco and Firearms, and I think she called the FBI . . . there [may have been] an investigation that followed." Even assuming *arguendo* that such complaints or investigations occurred, the tort of abuse of process lies in the misuse of the power of the *court*. *Meadows*, 59 Cal. Rptr. at 37. Under these circumstances, a reasonable fact-finder could infer, as recognized in *Zamos*, that Kenner's continued prosecution of the abuse of process claim, after learning that it had no merit, was evidence of a malicious intent. *See also Sycamore Ridge Apt's v. Naumann*, 69 Cal. Rptr. 3d 561, 579-81 (Ct. App. 2007) (applying *Zamos*).

2.   Ortner, Thomas, Paul Hastings and the Remaining
     Claims against Kenner

**[14]** With respect to Ortner, Thomas, Paul Hastings, and the remaining claims against Kenner, the Tuckers fail to pinpoint how any of the evidence in the record suggests that any of the attorney-Defendants filed *Death Row v. Tucker* and *Interscope v. Tucker* for a purpose other than honoring their clients' wishes. The Tuckers have not shown, with respect to these remaining claims, that the attorneys affirmatively knew that the factual bases for the underlying suits to be false at the time the suits were filed, *cf. Morrison*, 126 Cal. Rptr. 2d at 752. Nor have the Tuckers shown that any attorney-Defendant continued to prosecute any of the remaining claims after learning that they were not supported by probable cause. *Zamos*, 87 P.3d at 810. Given this lack of evidence, the district court correctly concluded that no reasonable trier of fact could find that the attorney-Defendants, with the exception of Kenner's claim for abuse of process, acted with malice when they filed the underlying litigation on behalf of Death Row and Interscope.[23]

## V.

### Loss of Consortium

Mr. Tucker's claim for loss of consortium was derivative of his wife's cause of action for malicious prosecution. The district court granted summary judgment in favor of all the Kenner and Interscope Defendants, in part, on the basis that Mr. Tucker's claim was tied to the malicious prosecution claims, which the court determined did not survive summary judgment. Were this the only basis for the court's disposition

---

[23]The dissent provides no legal authority from a California court for its assertion that a decision to file numerous claims is probative of malice. Dissent at 1835-36. Nor does the "two against one" posture of the underlying litigation, *see id.* at 1838, establish any triable issue regarding malice.

of this claim, reversal might well be warranted because we have concluded that the malicious prosecution claim must proceed as to Kenner. *See Snyder v. Michael's Stores, Inc.*, 945 P.2d 781, 785 (Cal. 1997) ("One spouse cannot have a loss of consortium claim without a prior disabling injury to the other spouse.").

However, the district court also reached the merits of Mr. Tucker's claim and concluded on the limited evidentiary record that, "the harm . . . is more akin to a loss of society and companionship than the type of longstanding and debilitating impairment to the relationship necessary to support a loss of consortium." We can affirm the district court's grant of summary judgment on any basis supported by the record, and we agree.

To support a loss of consortium claim, marital spouses must allege that their partner suffered an injury that is "sufficiently serious and disabling to raise the inference that the conjugal relationship is more than superficially or temporarily impaired." *Molien v. Kaiser Found. Hosp.*, 616 P.2d 813, 823 (Cal. 1980); *Anderson v. Northrop Corp.*, 250 Cal. Rptr. 189, 195 (Ct. App. 1988) (same). The injury may be physical or psychological, but psychological injury must "rise[ ] to the level of a 'neurosis, psychosis, chronic depression, or phobia' [to be] sufficient to substantially disturb the marital relationship." *Anderson*, 250 Cal. Rptr. at 195, quoting *Molien*, 616 P.2d at 813.

**[15]** We agree with the district court that Mr. Tucker's testimony does not raise a triable issue as to psychological injury sufficiently serious or disabling as to raise an inference that his relationship with his wife was more than superficially impaired. Therefore, the district court properly granted Defendants' motion for summary judgement as to Mr. Tucker's loss of consortium claims.

VI.

Conclusion

With the exception of the abuse of process claim where the Tuckers raised a triable issue as to Kenner's malice, the Tuckers did not produce evidence from which a jury could find malice, which is a necessary element of the malicious prosecution claim. Although Mrs. Tucker's estate may be entitled to recover damages for malicious prosecution, the district court appropriately granted summary judgment for the Kenner and Interscope Defendants with respect to Mr. Tucker's cause of action for loss of consortium. We therefore affirm the district court's grant of summary judgment in *Tucker v. Interscope*, No. 05-56045, and affirm in part and reverse in part the district court's grant of summary judgment in *Tucker v. Kenner*, No. 06-53376.

**05-56045 AFFIRMED.**

**06-53376 AFFIRMED in part; REVERSED in part; REMANDED.**

**In 05-56045, Defendants shall recover their costs on appeal.**

**In 06-53376, the parties shall bear their own costs on appeal.**

---

NOONAN, Circuit Judge, concurring and dissenting:

The legal question to be decided is whether Tucker presented sufficient evidence to create a triable issue of material fact as to whether Death Row and Kenner had sued her with malice when they began and continued a suit against her charging her with racketeering involving extortion, mail and

wire fraud; intentional interference with contract; and abuse of process, and whether there was sufficient evidence of malice to go to a jury as to whether Interscope, Ortner, and Paul, Hastings had acted with malice when they began and continued a suit against Tucker in which she was charged with conspiracy, disrupting a contract, depriving Interscope of property and extortion. The standard of review is that all inferences are to be drawn in favor of Tucker, the nonmoving party. It is evident, I believe, that Tucker submitted sufficient evidence to defeat the summary judgments in favor of Death Row Records, Interscope, Kenner, Ortner and Paul, Hastings. A statement of the facts, followed by a statement of the law will show the basis for this contention.

## FACTS

*The Cast of Principal Characters.* The plaintiff, C. Delores Tucker (Tucker), was a person of prominence in the African American community, in the Democratic Party, and in the Commonwealth of Pennsylvania. In the 1970's, she was Secretary of State of the Commonwealth — the first woman and the first African American to serve in this office. She served as Chair of the Democratic National Committee Black Caucus. She was the first African American president of the National Federation of Democratic Women. She crossed the path of the defendants by her concern over the popularity and promotion of gangsta rap and the impact of gangsta rap upon the behavior of black youths and upon the reputation of the black community. In 1995, she was 68 years-old.

Dionne Warwick (Warwick) had an established reputation in rhythm and blues, soul, and soft contemporary music. Warwick's public service included raising money for AIDS research, serving as the American Ambassador for Health in the 1980's, and acting as global ambassador for the UN's Food and Agriculture Organization in 2002. Her music reached a wide public and struck a note very different from that of gangsta rap, as in her signature song "Walk On By":

> If you see me walking down the street
> And I start to cry each time we meet
> Walk on by, walk on by
> Make believe that you don't see the tears
> Just let me grieve in private 'cause each time I see you
> I break down and cry

Death Row Records (Death Row), founded in 1991, is the producer of gangsta rap and other music. Its revenues are estimated to have been $900,000 in 1993 and to have been $33,000,000 in 2002. It is currently in bankruptcy. Its co-founder and CEO in the period 1993-1998, when the events relative to this litigation occurred, was Suge Knight. Death Row signed some of hip-hop's biggest stars, including Tupac Shakur, and dominated the rap industry in the mid-1990's. The company came to represent the West Coast rap movement in the emerging East Coast-West Coast rap rivalry that eventually led to the murders of Tupac Shakur in 1996 and Tupac's East Coast rival rapper, Biggie Smalls in 1997. At the time relevant to this litigation, Death Row had a distribution agreement with Interscope Records.

Marion "Suge" Knight, Jr. (Knight) was 28 years-old in 1993. He had been charged with and pled no contest to auto theft, possessing a concealed weapon, attempted murder, assault, and battery with a deadly weapon. He was convicted of assault in 1992 and placed on probation. In 1996, he was sentenced to nine years in prison for parole violation. Knight's criminal career after dates relevant to the litigation is omitted.

Interscope Records was a California general partnership consisting in 1993-1995 of Interscope Records, Inc. and Atlantic Ventures, an affiliate of Time Warner.

Time Warner is a media and communications company whose principal place of business is New York. Its total assets

in 1995 were $3.72 billion. At the start of the underlying suits, Time Warner owned a 50 percent share of Interscope Records through its affiliate Atlantic Ventures.

David Elliot Kenner (Kenner) was in 1995 a 53 year-old lawyer, a graduate of the law school of the University of Southern California, engaged in the solo practice of law in Encino, California.

Charles B. Ortner (Ortner) was 50 years old in 1995, had graduated from Brooklyn Law School, and was an attorney with Paul, Hastings.

Paul, Hastings, Janofsky & Walker (Paul, Hastings) is a large law firm headquartered in Los Angeles and has 17 other offices around the world employing 1200 attorneys.

*Events*. In 1993, when Tucker was the Chair of the National Political Congress of Black Women (the NPC), she listened to the plea of Warwick and Melba Moore, another well-known African American performer, to do something about "what's going on in Hollywood about our young people calling us whores and bitches and disrespecting and denigrating African American women." Tucker followed up by checking on whether this stuff was sold to children. If it was, she was going to "put my marching shoes back on that I marched with Dr. Martin Luther King hand in hand in Selma." The stuff was sold to children. Tucker began marching.

As president of the NPC, Tucker enlisted Warwick, Moore, Voncier Alexander, and Terri Rossi to form an Entertainment Commission, whose Mission Statement ran as follows:

> The goals of the National Political Congress of Black Women, Inc. (NPCBW) Entertainment Commission (NPCBW Entertainment Commission) are threefold:

- Seek to eliminate internal blockage in the industry that currently and most obviously prevents African Americans from the achievement of equal opportunities as artists and those positions of decision making.

- Mobilize African Americans in the industry to join the struggle to resolve critical issues affecting African American communities, particularly in the areas of education and health, where so many serve as role models and spokespersons.

- Offer strategies and solutions of reshaping and maintaining positive images to preserve the dignity and heritage of our youth . . . *instead* of continuously exposing our youth to negative media that distort their images of male/female relationships, undermines the stability of our families, communities and nation by encouraging violence, abuse and sexism as acceptable behaviors, and perpetuates the cycle of low self-esteem of African American youth.

Tucker's march had just started. She demonstrated outside a Tower Records store to protest its sale of albums of gangsta rap to minors. She gained support for her cause from a broad spectrum of national leaders, including William Bennett, Joe Lieberman, Tipper Gore, Bob Dole, and Sam Nunn. She testified before the Federal Communications Commission and before committees of Congress on the harm done by gangsta rap. She attended a Time Warner stockholders' meeting where she offered the corporation's executives $100 if they would read gangsta rap aloud to the meeting. In short, Tucker using the skills and smarts of a woman knowledgeable about political endeavors and media responses, took advantage of the democratic processes available to aroused citizens, and made herself a terrific nuisance to a principal producer of gangsta rap, Death Row.

On July 7, 1995, the NPC convened its biennial convention in Seattle. Suge Knight and Kenner as Death Row's lawyer met with Tucker and others. They discussed the formation of a distribution company owned by blacks that could distribute Death Row Records if Suge Knight eliminated the gangsta rap.

On August 7, 1995, Tucker and others drafted a letter for Knight's signature, memorializing the July 7 meeting. In the letter, Knight stated that Death Row "will cease and desist from the production and distribution of misogynist, obscene and pornographic music," a preliminary condition for Knight's authorization of NPC "to negotiate an acceptable contract relationship with Time Warner Inc. regarding the production and distribution of our music products." This letter was unsigned and delivered to Knight. The next day, August 8, Warwick arranged a meeting attended by about ten persons, some of them NPC members, not including Tucker, and four persons from Time Warner. Michael Fuchs, an executive of Warner Music, wanted to know if Knight had a contract with Interscope to distribute his records. Fuchs had flown from New York to meet Knight and "the purpose of the meeting was for [Fuchs] to sort of grill Suge Knight on his involvement or his relationship with Interscope." Knight had been invited, but wasn't there. He telephoned repeatedly from 11:00 A.M. to 4:00 P.M. to say he was on the way. Knight spent the day with his lawyer, Kenner, and James Iovine, then the President of Interscope Records.

The following day, August 9, Kenner drafted a letter signed by Kenner and Knight and addressed to Dionne Warwick. The letter rejected the draft letter sent to Knight, affirmed his position to stand by his music and musicians, and stated that Tucker had misunderstood him or was misrepresenting what he had said. The letter also rejected what it described as "Mr. Fuchs' offer, as conveyed to Mr. Knight, of an $80,000,000 advance and to provide him with two studios if he would agree to sign directly with Time Warner."

Kenner then conferred with Ortner, counsel for Interscope. On August 15, 1995, Ortner filed a complaint on behalf of Interscope against Tucker in the Central District of California. The complaint alleged that beginning in mid-1995, for her own "personal and financial gain," Tucker "together with others whose identities are [ ] unknown," engaged in a conspiracy to destroy Interscope by "committing extortion, threats, and other unlawful acts." Interscope's partner, the Time Warner affiliate, was also named but characterized as "a nominal defendant."

The first claim of the complaint was that as a result of Tucker's actions, "the contractual relationship between Interscope and Death Row Records has been disrupted." The second claim sought a preliminary and permanent injunction against these acts. The third claim was for such injunctions against Tucker attempting to induce Time Warner and its affiliate Atlantic Ventures to breach their fiduciary duty to Interscope. The fourth claim sought similar injunctions against Tucker engaging in unfair business practices and unfair competition, by reason of which "Interscope has incurred irreparable harm and has been deprived of its property rights." Compensatory, exemplary, and punitive damages were sought on each claim, along with reasonable attorneys fees. The complaint carried the name of three lawyers and the firm name of Paul, Hastings. It was signed in Ortner's name.

Two days later, on August 17, 1995, Kenner on behalf of Death Row also filed in the Central District a complaint against Tucker; the NPC; Time Warner; the Warner Music Group; Michael Fuchs; and Gerald Levin for "multiple violations of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961-68, as well as various other violations of federal and state laws." The allegations against Tucker were stated to be against her as an individual and as "a representative or officer of [the NPC]." Fuchs was identified as chairman of Warner Music and Levin as chairman of Time Warner. The defendants were alleged to be in a conspir-

acy "to enrich the Defendants themselves." The defendants were said to have engaged in their unlawful scheme "[f]or the past 13 months," that is, since July, 1994. Their acts began with "a smear campaign." "This campaign, primarily directed toward Defendant TIME WARNER, was and is an apparent attempt to induce action through political pressure." Tucker "did not disclose her ulterior motive to replace and supplement Interscope Records as the distributer of the recorded output of Death Row Records. This commercial goal was hidden and obscured by Defendant TUCKER." Among the acts charged against Tucker personally was her picketing of a Time Warner stockholders' meeting, her denouncing Time Warner "for their support of music containing 'explicit' lyrics, and its alleged denigration of African-American women." Tucker's recruitment of William Bennett and Bob Dole to her cause was also alleged against her.

The first cause of action set out was racketeering in violation of 18 U.S.C. § 1962(b) and (c). Tucker, the NPC "and others" unknown were said to have formed an enterprise to establish "a record distribution company controlled by Defendant TUCKER." The enterprise was attempting to secure its objective by a "pattern of racketeering activity." The predicate criminal acts included extortion, that is, an attempt to obtain property from Death Row Records "by a wrongful use of force or fear against Knight" resulting in "actual," although unknown, damages to Death Row. Mail fraud in violation of 18 U.S.C. § 1841 was another part of the pattern, a crime carried out by the draft letter proposed for Knight's signature on August 7, 1995. Wire fraud in violation of 18 U.S.C. § 1343 was also part of the pattern, the fraud consisting in unspecified uses of "the wires, radio, or televison communications" with the result of actual, but unknown, damage to Death Row. The defendants were further charged with criminal interference with interstate commerce in violation of 18 U.S.C. § 1951-2, a crime alleged to have been committed simply "by transporting persons and things in interstate commerce" in furtherance of their scheme. A final element of the unlawful

pattern was the conspiracy of the defendants to achieve their unlawful end.

The second cause of action alleged conspiracy in violation of 18 U.S.C. § 1962(d) and sought treble damages for unspecified harm. The third cause of action alleged a "conspiracy to interfere with advantageous business relationships" broadly said to be "in violation of federal and state law." The fourth cause of action was for intentional interference with contract and prospective business advantage. The fifth cause of action made "extortion" its gravamen. The sixth cause of action was "unfair business practices"; the seventh was "abuse of process," by the defendants "threatening to fabricate and pursue a course of conduct designed to cause criminal and civil liability to Knight," a crime amounting to "wrongful use of the criminal and civil justice system."

Death Row sought an injunction against all the defendants, treble damages for the first and for the second causes of action, and compensatory, exemplary, and punitive damages for all causes of action.

In October 1995, two months after the litigation began, an ad appeared in *The Source*, a hip-hop magazine, listing twelve black freedom fighters such as Martin Luther King, Jr. and Nelson Mandela. To this list a thirteenth name had been added, that of Tucker. A red line was drawn through this name. At the bottom of the ad were two quotes. The first was attributed to Martin Luther King, Jr.: "When we let freedom ring, . . . we will be able to speed up that day when all of God's children . . . will be able to join hands and sing . . . 'Free at last! Free at last! Thank God Almighty, we are free at last.'" A second quote followed under this first one. Underneath this paragraph and parallel to it were these words: "Whether it's freedom for our people or freedom for our people to say what's on their minds the fight lives on . . . ." Following this quotation, its author was identified as "Suge Knight, CEO of Death Row Records.

On October 4, 1995, Kenner wrote counsel for Tucker, stating "Death Row, because of the actions of the parties, including your clients, has been damaged and Death Row Records has every right to proceed to have their case heard without delay." Death Row and Interscope made demand for the production of documents including "without limitation, any communication, notes of conversations, correspondence, contracts, proposals, drafts and/or memoranda . . . that reflect, refer, or relate to Interscope, Death Row and/or rap music" and "[a]ll of your personal and business telephone records, logs, messages and related documents, for the period of January 1, 1995 to the present." In their capacity as plaintiffs, they also took Tucker's testimony for four days of depositions. A month later, they took another four days, so that the total testimony came to 1,700 pages contained in eight volumes. In 1996, approximately thirteen months later, they took another three days of depositions from Tucker, adding three more volumes to the total.

In February 1996, Death Row produced and Interscope distributed an album sung by Tupac Shakur. One song, "How Do U Want It?" asked:

> Now tell me is it cool to fuck?
> Did you think I came to talk?

The rapper went on in the course of his song to say:

> Delores Tucker, yous a muthafucka,
> Instead of trying to help a nigga you
> Destroy a brotha, worst than the others,
> Bill Clinton, Mr. Bob Dole, you too old
> To understand the way the game's told.
> You lame soul, I got to hit you with the high facts.
> When some release makin' millions . . . .

A second song on the album, "Wonda Why They Call U Bitch," concluded:

> Dear Ms. Delores Tucker, you keep stressin' me,
> Fuckin' with a motherfuckin' mind.
> I figured you wanted to know, you know,
> Why we call them ho's bitches.
> Maybe this might help you understand.
> It ain't personal.
> It's strictly business, baby, strictly business.
> So if u wonda why we call u bitch
> U wonda why we call u bitch
> If u wonda why we call u bitch,
> U wonda why we call u bitch.

Trial was finally set, for October 27, 1998. On June 1, 1998, Death Row filed a notice of motion to dismiss its entire action. The reasons given were that Death Row and Interscope had severed their relationship and Death Row no longer needed injunctive relief to protect it and that investigation had shown that Tucker and the NPC lacked money to satisfy the damages to which Death Row was entitled. Interscope also moved for dismissal of its action. On June 18, 1998, the motions were granted.

## PROCEEDINGS

Judge Paez's opinion accurately states the beginning and course of the two cases now consolidated for decision. Tucker died at the age of 78 in 2005; her husband, William Tucker, is now her personal representative. Death Row is in bankruptcy, and its bankruptcy estate is being managed by a court-appointed trustee.

The district court's ruling in the Kenner case was as follows:

> While the court notes that Kenner lacked probable cause to pursue a claim of abuse of process in the underlying litigation, the evidence Plaintiffs offer in addition to this finding is insufficient to show that

Kenner acted with malice. Plaintiffs have offered no evidence to support their allegation that Kenner knew no threats were levied against his client. Moreover, Plaintiffs' assertion is inconsistent with Kenner's deposition testimony as well as Mrs. Tucker's admission that she did contact the Justice Department and the FBI regarding Death Row Records. Lastly, Plaintiffs' allegations about Kenner's conduct during the course of litigation amount to nothing more than mere speculation and fail to demonstrate actual hostility or ill will. A reasonable jury could not return a verdict in Plaintiffs' favor on this evidence. As such, summary judgment is warranted as to this issue.

The district court added:

Defendant Kenner also seeks clarification as to the court's ruling regarding probable cause and favorable termination. The court advises Defendant that genuine issues of fact existed as to both issues which precluded a finding as a matter of law in his favor.

In the Interscope case, the court found that genuine issues of material fact remained as to Interscope Records' probable cause for inducement to breach contract and inducement to breach fiduciary duty as well as Death Row's probable cause to file claims for RICO violations, extortion, and abuse of process.

## ANALYSIS

In these diversity cases, it is uncontested that California law should govern. We consider them separately except to note that both suits brought by the defendants against Tucker terminated in her favor. A necessary element of a case for malicious prosecution is judgment against the plaintiffs in the suits that they maliciously launched. Under California law a volun-

tary dismissal accepted by the court constitutes such a judgment even though the phrase "with prejudice" is not added to the dismissal. *Fuentes v. Berry*, 38 Cal. App. 4th 1800, 1808 (1995).

*Tucker v. Kenner*. On the evidence presented by Tucker, a jury could conclude that Kenner lacked probable cause and filed and pursued Death Row's action against Tucker and the NPC with malice.

First, as to the objective lack of probable cause: The district court has already ruled that there are triable issues of fact as to probable cause. Death Row and Kenner have not appealed that ruling. It may, therefore, seem to be a work of supererogation to review the counts of the Death Row complaint in terms of their lack of any foundation in fact. That, however, is not the case. Lack of probable cause can be an element in the proof of malice. Even more significantly, *knowledge* of the lack of probable cause is itself proof from which a jury may infer malice. *Swat-Fame, Inc. v. Goldstein*, 101 Cal. App. 4th 613, 634 (2002). Reasons exist, therefore, to review the lack of probable cause for many of the claims of the quondam plaintiffs and the likelihood that the claims were knowingly brought without cause.

First, after three years of investigation, discovery, and deposition-taking, Kenner voluntarily withdrew Death Row's action against Tucker, including the claims that she had committed a variety of federal and state crimes. A jury could reasonably infer that the stated reason that Tucker and the NPC were judgment-proof was window-dressing meant to disguise the absence of any fact supporting the outrageous claims asserted. Second, a jury could make an inference from the difference between the Interscope and Death Row complaints. Although both companies and their lawyers were in communication in preparing their respective suits, and although both corporations had the same information about Tucker and the same reasons to hate her, Interscope did not charge Tucker

with racketeering. If there were any evidence of racketeering in possession of Death Row, a jury could infer that it would have been shared with Interscope. The absence of racketeering charges in Interscope's complaint would permit a rational trier of fact to conclude that, more probably than not, Death Row and Kenner knew no facts to support their racketeering claims. Third, a jury could also infer from the extraordinary vagueness of several of Death Row's criminal charges that Kenner was merely using boiler plate without possession of any facts on which to act. A trier of fact could consider, for example, the failure to identify any actual harm caused by the conduct complained of; the utterly unspecified reference to "uses" of "the wires"; the strange charge of criminal interference in interstate commerce by the transport of "persons and things." Fourth, a jury could also infer that the racketeering charges against the NPC were without any foundation and without any purpose except to make out Tucker as a scheming and faithless fiduciary who would manipulate an educational group for her own private profit.

Fifth, the district court has ruled as a matter of law that Kenner lacked probable cause to bring the claim for abuse of process. This ruling has not been appealed and is the law of the case. A jury could infer that if Kenner lacked probable cause so did Death Row. Further, a jury could infer that Kenner knew there was no probable cause for this claim. As a lawyer, Kenner must have known that an abuse of process "is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice," and thus, the essence of an abuse of process claim "lies in the misuse of the power of the court." *Meadows v. Bakersfield Sav. & Loan Ass'n*, 250 Cal. App. 2d 749, 753 (1967). Tucker had brought no suit against his client. A jury could well infer that the knowing assertion of this claim manifested malice.

Similarly, an action for intentional interference with contract requires an *actual* breach or disruption of the contractual relationship. *Quelimane Co. v. Stewart Title Guar. Co.*, 960

P.2d 513, 530 (Cal. 1998). The absence of any evidence of an actual breach could allow a jury to infer that Kenner knowingly brought and continued Death Row's actions without probable cause.

Finally, that the August 7, 1995 letter authorized the NPC, and not Tucker, to "negotiate an acceptable contract relationship" on behalf of Death Row suggests that Tucker could not have harbored a ulterior motive of personal enrichment as alleged in Death Row's complaint. A jury could infer from this letter that Kenner had no probable cause and therefore harbored malice in attributing hidden motives to Tucker where no such evidence existed.

As to evidence from which a rational trier of fact could infer malice, *Swat-Fame,* 101 Cal. App. 4th at 634, shows that the *knowing* bringing of a baseless claim is sufficient for a jury to conclude that a case was brought maliciously. Second, the charges against Tucker evince hatred. A 68 year-old civic leader is charged with a spate of offenses that would be appropriate to an indictment of a mafioso. She is an extortionist and a racketeer. She has organized a racketeering enterprise to enrich herself. Malice gleams from Death Row's complaint.

Third, the allegations in the complaint specifically set out the criminal conduct charged to Tucker as beginning in 1994. In their brief on appeal the defendants acknowledge that Tucker had a perfect right under the First Amendment to agitate against gangsta rap and to ask others to join in her cause. That is precisely what she was doing in 1994. Not even a shred of evidence exists to show that this veteran of the civil rights movement was acting for her personal profit on any occasion in 1994. What Tucker was doing, both in 1994 and in 1995, a jury could find, was what Bob Dole, Tipper Gore and Joe Lieberman were doing — telling Time Warner and its affiliate, "Get this stuff off the air. You should be deeply ashamed. You are maligning women. You are promoting law-

lessness. You are denigrating an entire ethnic community. For heaven's sake and for the sake of your own reputation, get out of it." Warwick, a deeply respected singer, had taken the lead. Yet Tucker alone was charged with racketeering and a pattern of racketeering reaching back to the period of her acknowledged First Amendment activity. Her profit-seeking motive is alleged to have been "hidden." A jury could conclude that a hidden motive was an imagined motive, a motive maliciously conjured up to bolster Death Row's complaint. Only malicious minds, a jury might decide, could so construe her tough-minded and democratic strategy.

Fourth, former education Secretary William Bennett is named as a recruit of Tucker. His recruitment is an asserted part of the pattern of racketeering. The dogged determination to do in Tucker is manifestly malicious when her wooing of a senior American political leader is asserted to constitute criminal behavior.

Fifth, the complaint alleged that Levin, the CEO of Time Warner, and Fuchs, the CEO of Warner Music, were engaged in the racketeering conspiracy to enrich Tucker. The sheer implausibility of this claim, unsupported by any specific allegations, could lead a jury to infer malice. Hate-filled malignancy, a jury could infer, had led to the fantastic supposition that a multi-billion dollar corporation sought to enrich Tucker by cooperating in her racketeering.

Sixth, a jury could infer malice from the way Death Row and its counsel conducted the case — first asserting a need for a prompt trial but at no point moving for a restraining order or preliminary injunction; besieging Tucker with an oppressive demand for discovery; harassing Tucker with days of deposition-taking, while taking very little deposition testimony from Warwick, who participated in the August meeting; and taking no depositions from Fuchs and Levin, alleged to be Tucker's partners in crime.

Seventh, three publications outside of the Death Row complaint shed light on Death Row's motives. The first is the ad in *The Source*. Tucker believed that the ad called for her death. She was deposed as to the pain it caused her and the precautions she felt obliged to take to prevent being killed. No direct evidence was submitted establishing that Death Row paid for the ad. A jury could take into account two facts: (1) The concluding quotation was ascribed to Knight in his corporate capacity. This quotation is paired with the quotation of Martin Luther King, Jr.; (2) Knight had reason to hate Tucker. This full page ad improbably put Knight on par with King, pointedly identified Knight as Death Row's CEO, and marked Tucker, at least symbolically, for destruction. The inference could rationally be drawn that the ad was inserted in *The Source* by Death Row and was significant evidence of its malice as it continued its suit against Tucker. The two songs made by Tupac under the Death Row record label during the litigation demonstrate the strongest antipathy to Tucker, who is assailed in vile language. A jury could well conclude, If this evidence does not exhibit malice, what would?

Kenner is not personally responsible for the ad or the lyrics. He is responsible for setting out the malicious imaginings of a client with such hate, or so a jury could conclude. Kenner could be held responsible for the irresponsible assortment of criminal charges in the complaint against Tucker that he drafted and filed. Despite his extensive experience with the criminal law, Knight does not appear to have had the education necessary to conceive of the RICO charges and to express Tucker's alleged crimes in words fitted to the statutory provisions invoked. A jury could well conclude that the special malice of the racketeering allegations owed their origin and presentation to the knowledge and skills of Kenner. An attorney cannot escape liability by saying, "I was only a hired gun. My client and its CEO may have been malicious, but I was not." Kenner could be found to have begun and continued the suit sharing the malice of his client and to have expressed malice in the drafting of the complaint.

It is argued that the ad in *The Source* and Tupac's lyrics are not evidence of malice at the start of the suit because they appeared after the suit was started. For two reasons, this argument is unconvincing. First, a jury could well infer that the hatred of Tucker displayed in the ad and in the lyrics was not a sudden development arising out of the suit, but the overt demonstration of what had smouldered and been fueled by anger at Tucker's campaign against gangsta rap. Second, it is good California law that malice in continuing a lawsuit is as actionable as malice in originating it. *Zamos v. Stroud*, 87 P.3d 802, 810 (Cal. 2004). The ad and the lyrics demonstrate malice in the prosecution of the suit.

It has been suggested that the ad can be read as the personal act of Suge Knight, not of Death Row. Again that argument cannot be sustained. First, Knight's corporate title was used to identify him. Second, Knight — as far as this record shows — was Death Row. When he appears in the record, he is bargaining, complaining, negotiating for Death Row without reference to its directors or to any corporate control. He is it, or so a jury could reasonably infer.

It has been suggested that Death Row is not responsible for Tupac's lyrics. The suggestion is one possible reading of the evidence. But a jury could reasonably infer that the extraordinarily pointed references to Tucker did not arise out of any special animus against her on Tupac's part but were designed by Death Row and its CEO to bring their adversary into a public pillory.

*Tucker v. Interscope, Death Row, Ortner, and Paul, Hastings.* Tucker sued Interscope, Death Row, Ortner and Paul, Hastings on five grounds that have been winnowed in the course of its action and an appeal consists in a single claim of malicious prosecution. Again, it is desirable to examine the elements of the claim that consist in the lack of probable cause as well as the presence of malice. A jury could infer Death Row's malice and lack of probable cause from the

same evidence showing Kenner's malice and lack of probable cause, as discussed earlier. What of the acts of Interscope taken by itself and of the lawyers representing Interscope in the litigation against Tucker?

Interscope's complaint alleged that Tucker was a conspirator engaged in extortion and other unlawful acts for her own profit. The few facts stated in the complaint focused on hazy and inconclusive accounts of the July 1995 meeting and on accounts of the August 1995 meeting held by Warwick from which Knight, Kenner, and Tucker were all absent. A jury could infer that not only was probable cause lacking for these baseless charges, but that Interscope and its lawyers, Ortner and his firm, knew that the charges were baseless.

Second, a theory of both complaints was that Tucker was using her leverage with Time Warner, no doubt sensitive to adverse publicity, to break Interscope's contract with Death Row. In fact, however, in September 1995, less than two months afer the complaints were filed, Time Warner terminated the only investment it had in the joint venture with Interscope. Despite the absence now of any channel by which Tucker could affect Death Row's relation to Interscope, the suit continued for three years without a foundational fact.

Third, the plaintiffs lined up against Tucker were Death Row and Interscope. Yet she was alleged to be disrupting their relation. The improbability of the two plaintiffs being set against each other by Tucker would permit a jury to infer that the suits were continued after they had lost even a smidgen of probability.

Fourth, the claim that the Interscope-Death Row relationship had been disrupted was palpably untrue. The contract between them had not been breached. Their counsel, Ortner and Kenner, worked hand and glove together, or so the jury might infer from the coordination of the complaints. The allegation that Interscope had "incurred irreparable harm" and

had been "deprived of its property rights" was unsupported and inferably known by the Interscope attorneys to be untrue.

*Conclusion*. The evidence in this record, interpreted as it must be, in favor of the nonmoving party is sufficient to require the reversal of summary judgment for Kenner, Death Row, Interscope, Ortner, and Paul, Hastings. As a matter of law, their cases against her ended with prejudice. The law of this case is that there are triable issues as to probable cause. Tucker's evidence affords multiple instances where a jury could infer, from what Death Row, Kenner, Interscope, and Ortner said and did, that the suits brought and maintained against Tucker were knowingly and therefore maliciously filed without probable cause and were prosecuted with malice for three years in an oppressive way, long after a scintilla of cause had been extinguished.

Two issues appear to divide the court. The first is whether malicious prosecution can be shown by malicious acts by a defendant performed after the defendant has brought the lawsuit that the plaintiff complains of. Judge Paez's opinion seems to suggest that malice in the mind of the defendant can only be shown by what is alleged in his complaint. That view of the law is mistaken. Malice may be shown by malicious acts subsequent to the complaint in the continuation of the lawsuit. *See Zamos*, 87 P.3d 802; *Del Rio v. Jetton*, 55 Cal. App. 4th 30, 36 (1997).

In *Zamos*, the court listed the elements of a suit for malicious prosecution, including the requirement that the suit was "*initiated* with malice." *Zamos*, 87 P.3d at 807 (citations omitted) (italics in original). The court noted that the defendants in the case before it argued that *continuing* to prosecute a lawsuit discovered to lack probable cause did not constitute the tort of malicious prosecution. *Id*. The court rejected the defendants' argument. Its holding stated: "We conclude an attorney may be held liable for continuing to prosecute a lawsuit discovered to lack probable cause." *Id.* at 803. As in *Swat-Fame*,

knowledge of the lack of probable cause (in the court's phrase "discovery" of this lack) supplies the malice that supports the tort.

The second division is on whether knowing lack of probable cause may constitute proof of malice. Stressing the objective character of probable cause, Judge Paez's opinion suggests that absence of probable cause is not relevant to malice. But when a suit is brought without probable cause and the allegator knows that he has no probable cause, a window is opened to the mind of the allegator. California law clearly states that although lack of probable cause alone does not support an inference of malice, "malice may still be inferred when a party *knowingly* brings an action without probable cause." *Swat-Fame*, 101 Cal. App. 4th at 634 (citation omitted) (italics in original). Knowing that he has no basis for what he alleges, the allegator manifests malice in the hateful acts he imagines and attributes to the enemy he is pursuing.

In discussing Kenner's malice in charging Tucker with abuse of process, Judge Paez observes: a "fact-finder could reasonably infer from Kenner's drafting of the complaint [charging Tucker with abuse of process] that he did not believe the claim was valid when filed, or that the claim was instituted for an improper purpose." I agree with this reasoning, concur in Judge Paez's conclusion as to the vitality of Tucker's claim for malicious prosecution in Kenner's charge of abuse of process and wonder why the same rule does not apply to the other claims advanced by the defendants where inferably they know they had no probable cause. I do not understand how this court, years after the original litigation, is capable of determining the state of mind of the defendants here. That is a question of fact. As a question of fact it is for a jury to decide.

In both our cases, an experienced fighter for civil rights, acting to defend her community, was charged with extortion, with seeking to enrich herself, and exploiting her own organi-

zation for her profit. Further, in the case brought by Kenner she was accused of committing major federal crimes nonexistent in fact and so vaguely alleged as to show on the face of the complaint that the lawyer had conjured them up or simply filled in a blank form. The court is in no position to conclude that the lawyers and their clients believed that these charges were true, rather than unscrupulous inventions. Indeed almost anyone would doubt that sophisticated lawyers could have known anything except that the charges were false. In any event, it is not for us now to decide this question, but to allow a jury to determine whether the lawsuits against Tucker were brought without probable cause and with knowledge of the absence of probable cause and therefore with malice. A court of the United States presented with a record as the one before us should not walk on by.